Jack GEE, Jr. and William D. Harris, Esquire, Executor of the Estate of Jack Gee, Sr.

v.

CBS, INC., and Columbia Records, Inc.

Civ. A. No. 75–1792.

United States District Court, E. D. Pennsylvania.

March 7, 1979.

Herbert B. Newberg, Lloyd Zane Remick, Philadelphia, Pa., for plaintiffs.

James D. Fornari, George P. Williams, III, Philadelphia, Pa., Christine Philpot Clark, New York City, for defendants.

## OPINION AND ORDER

EDWARD R. BECKER, District Judge.

### I. *Preliminary Statement*

This suit for damages and injunctive relief arises out of the luminous career of the late Bessie Smith, who may be fairly described as "Empress of the Blues." *See* C. Albertson, *Bessie* (1972). Bessie Smith ("Smith") was a great singer and composer

of the "blues."[1] During the 1920's, Smith was one of America's top box office attractions and recording stars. From 1923 to 1928, the theatres in which she appeared on tour were filled to overflowing and thousands were turned away. During that period Smith earned from $1,500 to $2,000 per week, a staggering sum for anyone then to earn, and an awesome achievement for a black woman of that era.

From 1923 until her death in 1937, Smith was an exclusive recording artist for Columbia Phonograph Company, whose successor, Columbia Records, Inc. and its parent corporation, CBS, Inc., are the defendants herein. Some of plaintiffs' claims relate to Columbia Phonograph Company in the 1920's and 1930's and some to actions of its corporate successors in the 1950's and 1970's. For convenience defendants will simply be referred to as "Columbia." Smith died on September 26, 1937, in a tragic automobile accident near Clarksdale, Mississippi.[2] She was survived by her husband, Jack Gee, Sr., who died in 1975. His executor, William D. Harris, is one of the plaintiffs herein. The other plaintiff is one Jack Gee, Jr., who claims to be the adopted son of Smith and Jack Gee, Sr.[3]

The multifaceted suit asserts a variety of claims against Columbia arising out of its dealings with Smith and her recordings during her lifetime, and out of Columbia's posthumous issue and reissue of those recordings. The case was originally filed only by Jack Gee, Jr., and its initial allegations concerned only federal copyright protection which Smith either obtained or might have obtained for the approximately forty (40) songs she composed, as well as recorded, between 1924 and 1934.[4] The original complaint alleged that this copyright protection was subsequently infringed by defendants.

Columbia filed a motion to dismiss, based on plaintiff's failure to allege ownership of the copyrights and renewals upon which he based his claim. At this juncture, alleging that many if not all of the copyright registrations referred to in the original complaint were renewed in the name of Jack Gee, Sr. "as spouse and heir of Bessie Smith" and that they were still in effect, Jack Gee, Jr. filed an amended complaint adding Mr. Harris, Jack Gee, Sr.'s executor, as party plaintiff. What is now before us, however, on defendants' motion to dismiss, or in the alternative for summary judgment, is plaintiff's *second* amended complaint ("complaint") which adds a number

---

1. "Blues" is a distinctive form of music. Stanley Edgar Hyman, the noted critic, describes it as follows:

   > Technically—and as a musical illiterate I simply parrot my betters—the blues is usually a song in twelve bars: melodically peculiar in that the third and seventh intervals, and sometimes the fifth, are flated, harmonically restricted to a simple progression of the tonic, subdominant, and dominant seventh, the old hymn chords; rhythmically 4/4 with offbeat phrasing. The lyrics are a rhyming couplet with the first line repeated, AAB, each line in four bars, with the words characteristically ending in the middle of the third bar, leaving the accompaniment to fill out the remaining bar and a half. That is the standard form, but there are many variants: eight-bar blues that are a simple AB; sixteen-bar blues often AAAB; even a twelve-bar form that the performers call "fast blues". . . . Despite the variations, the harmonies are always the same fixed sequence, and all of the thousands of blues that have been sung fit into a form as tight and perfect as the Petrarchan sonnet.

Hyman, *The Blues*, 1 Bennington Review 104 (1978).

2. The circumstances of Smith's death have themselves been the focal point of much public attention and controversy, and ultimately became the subject of a 1960 Edward Albee play, "The Death of Bessie Smith." The controversy relates to whether Smith died as the result of catastrophic injuries and loss of blood sustained in the accident or because she was denied admission to a "white" hospital and died from loss of blood before she could be attended at an inadequately equipped "black" hospital to which she then was taken. *See generally* C. Albertson, *Bessie* (1972) ch. 11.

3. Apparently, no one has ever located adoption records or an amended birth certificate such as usually accompanies a decree of adoption. Jack Gee, Jr. asserts his claim as Smith's adoptive son herein on the basis of certain records and correspondence from schools.

4. Smith composed approximately one quarter of all of the songs she recorded.

of additional claims [5] which may be summarized as follows.[6]

First, the complaint asserts that all the recording contracts and copyright agreements entered into by Smith and Columbia between 1924 and 1933 are invalid because of their unconscionability and Columbia's overreaching: Columbia is said to have taken advantage of Smith's illiteracy and lack of sophistication in business affairs. Complementing these allegations are the claims that the invalid contractual dealings were the product of race discrimination. On the average, Smith received a flat fee of $200 per selection recorded for Columbia with no royalties, allegedly in contrast to much larger sums, including royalties, paid to white artists then recording for Columbia such as Eddie Cantor, Ted Lewis, Rudy Vallee, Sophie Tucker and Bing Crosby. The complaint alleges that this corporate racism constituted wilful and intentional violation of the civil rights of Smith and of others similarly situated "by failing to afford them the opportunity to make and enforce contracts to the full extent as is enjoyed by white citizens, in violation of 42 U.S.C. § 1981." Plaintiffs have also advanced a novel theory of § 1981 liability by contending that these original contract discriminations are actually direct wrongs to *themselves*, as Smith's heirs.

The § 1981 claims are asserted in Count I of the complaint; Count II alleges invalidity of the 1924–33 recording contracts as a matter of state contract law. Count III focuses exclusively on copyrights, apparently under both federal and state (common) law. Counts IV and V, also added in the second amended Complaint, concern actions taken by Columbia in the past two decades. Columbia decided to re-issue Smith's records in album form in the early 1950's, and again in the early 1970's. On both occasions it re-recorded the songs using available new technology, re-assembled the original 78 r. p. m. records into 33 r. p. m. album format, wrote biographical and descriptive

notes for the album jackets and printed photographs of Smith on the jacket covers.

In Count IV, plaintiffs claim that by re-recording the original 78 r. p. m. songs in the 1950's and again in the 1970's without the permission of Bessie Smith's heirs, Columbia infringed property rights protected under state law. Those property rights are said to have vested in Smith at the time she originally recorded the songs between 1923 and 1933, and relate not to her composition of forty of the songs, but to her *singing style* on the 160 records. In essence, the claim is that Smith acquired rights in her artistic performance which have descended to her heirs, the present plaintiffs, which rights were abridged in the early 1950's and again in the early 1970's. Count IV also contains a claim focusing on the reissuance in 1952 of one record ("At the Christmas Ball") for which Smith was never paid at the time of its original recording, and another claim focusing on the re-issuance of eight songs for which plaintiffs claim Smith was not fully paid in the 1930's. Under the rubric "misappropriation of artistic property," these nine songs are also the subject of a motion for summary judgment by the plaintiffs.

Count V concerns "publicity rights." These are analogous to, but somewhat distinct from, the "artistic performing rights" which are the subject of Count IV. Plaintiffs complain in Count V that defendant has exploited the image and likeness of Bessie Smith on record jackets and elsewhere, without their permission.

Upon analyzing plaintiffs' claims, one is struck at once by their vintage. The claims asserted in Counts I & II arose more than forty years ago (and some as much as fifty years ago). The claims in the other counts are also hoary, except for those relating to the 1970's reissues. Accordingly, defendants have invoked the applicable statutes of limitations. Such statutes, in the words of the Supreme Court are:

---

5. The copyright claims now appear in Count III of the complaint.

6. The original and first amended complaints also named Empress Music, Inc., as a defendant, but Empress was dismissed following a settlement.

designed to promote justice by preventing surprises through the revival of claims that have been allowed to slumber until evidence has been lost, memories have faded, and witnesses have disappeared. The theory is that even if one has a just claim it is unjust not to put the adversary on notice to defend within the period of limitation and that the right to be free of stale claims in time comes to prevail over the right to prosecute them. *Order of Railroad Telegraphers v. Railway Express Agency*, 321 U.S. 342, 348–49, 64 S.Ct. 582, 586, 88 L.Ed. 788 (1944).

Plaintiffs on the other hand contend that notwithstanding the age of the claims, under the facts of record the applicable statutes of limitations must be tolled. Plaintiffs have propounded four different tolling theories which we shall, in due course, consider in detail: 1) tolling because of inherent fraud in the transactions; 2) tolling because of subsequent fraudulent concealment by defendant; 3) tolling because of a breach of fiduciary or agency duty and subsequent concealment of that breach; and 4) tolling because of a "revival" of a stale claim by a recent acknowledgment. The third argument stems from the fact that during most of Bessie's recording career her alleged "manager," Frank Walker, was a Columbia executive. The fourth argument results from the fact that in 1974, Columbia's President, Bruce Lundvall, noting the disparity between sums paid to the artists circa 1974 and those paid in days past, announced that Columbia was donating some of the proceeds of sale of the 1970–72 reissue to a scholarship fund for needy black students.

Needless to say, a significant portion of this opinion will be concerned with statute of limitations matters. However, the stat-

ute of limitations arguments are not the only points of substance raised by Columbia. Equally cogent are their arguments about plaintiffs' standing to bring the action (and the real party in interest rule) and their arguments against the cognizability of plaintiffs' Count IV & V claims.

As we have noted, the matter is before us not only on a motion to dismiss but also on partial (cross) motions for summary judgment. The various arguments raised by the defendants in support of these motions—including the important statute of limitations points—are thus presented on a factual record. That factual record is an extensive one, coming to us in the form of affidavits (filed mainly by the plaintiffs); certain copyright assignments executed by Jack Gee, Sr. (filed by the defendants); and pretrial discovery (principally deposition transcripts) filed of record. Interestingly, it is apparent that the vast bulk of the data accumulated by plaintiffs derives either from Chris Albertson's biography of Smith, which is itself part of the record (as an exhibit to the deposition of one John Hammond), or from Albertson's research.

Albertson has chronicled Smith's life and times in great detail, drawing mainly upon interviews with persons who knew her. His volume sheds helpful background light upon the statute of limitations problem by demonstrating that many, if not most of the people who might have had knowledge of the events of the 1920's surrounding Smith's relationship with Columbia, are now dead.[7] It is worth noting too that the Albertson book (and research) seems veritably to be the wellspring of plaintiff's case. For example, whole paragraphs of the complaint are copied almost verbatim from the volume.[8]

---

**7.** The three people with principal knowledge, all deceased, are Smith, Jack Gee, Sr., and Frank Walker. Mr. Walker died over ten years ago (Hammond deposition).

**8.** When we make mention of Albertson's research we refer particularly to his unearthing from Columbia's files various ledger sheets which showed what Smith was paid for various recordings.

While not a basis for our judgment, it is also worthy of note that Albertson's book is, in its dominant respects, damaging to plaintiffs' case. Plaintiffs, as appears *infra*, have repeatedly urged tolling of the statute of limitations because of Smith's and her husband's purported lack of business experience and lack of sophistication. But the portrait of Smith that emerges in Albertson's book does not suggest that she was lacking in sophistication. Rather,

We shall not summarize the extensive record at this juncture. Rather, we will make reference to the necessary record facts as we confront each argument. Suffice it to say now that for reasons set forth in the extensive discussion which follows, judgment under either Rule 12 or Rule 56 will be granted for defendants on all of plaintiffs' claims.

We engage in such extensive discussion notwithstanding what we deem to be an inexorable result (given the many problems with plaintiff's claims) for two reasons. First, we are impressed with the great resourcefulness and sophistication of the arguments advanced by plaintiffs' counsel. Second, given the great stature of Bessie Smith in the history of American music and the consequent importance of this case, we can do no less.

## II. The Civil Rights Claim (42 U.S.C. § 1981)

### A. Introduction

In Count I plaintiffs assert a claim based upon 42 U.S.C. § 1981, which provides:

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

Plaintiffs' § 1981 claim rests specifically on the "to make and enforce contracts" phrase of § 1981,[9] and is, at first blush, straightforward: Columbia Records, during the 1920's and 1930's, discriminated against all black performers by fraudulently signing them to contracts with low payment terms and no royalty provisions, while at the same time signing white performers to contracts for much greater sums, including royalty provisions; Bessie Smith was one of many performers who suffered from this contractual discrimination.

Since Smith died in 1937, plaintiffs realize they must connect the alleged wrong to Smith in the 1920's and 1930's with a protected right of their own. They have attempted to do so on two different theories. One is by action of the appropriate survival statute: Since plaintiffs are the putative son of Bessie Smith and the heirs of Bessie Smith's husband, they can sue in a representative capacity for any cause of action which Bessie Smith had at her death which

---

it portrays her as a woman in complete command of herself and of her considerable entourage, which she took with her on her private railroad car to perform in her tent show during the 1920's. Albertson makes clear too that Smith's principal interest was in her live performances, and while her records played an important role in her career, that role was principally to popularize her as a live performer. Moreover, Albertson notes that during significant portions of the period at issue, Columbia was a struggling young company which had just emerged from bankruptcy (and was to encounter it again in the great depression of the 1930's). Albertson also wrote about Jack Gee, Sr., who was active in a number of Smith's dealings with Columbia. Gee is portrayed not as naive or unsophisticated, but rather as a tough bargainer with an avid interest in money matters.

**9.** The precise claim is set forth in the second amended complaint as follows:

31. As a result of the defendants' actions as aforesaid (see paragraphs printed pp. 617-621 infra) in refusing to adequately compensate Bessie Smith and other black artists who recorded for Columbia's "race record series" of the 1920's and early 1930's, in contrast to substantial compensation by means of large advance payments and/or royalty agreements with white artists who were recording for Columbia in the same time period, defendants, and each of them, have willfully and intentionally violated the civil rights of Bessie Smith and others similarly situated by failing to afford them the opportunity to make and enforce contracts to the full and equal extent as is enjoyed by white citizens, in violation of 42 U.S.C. § 1981.

32. The effects of such past discrimination are continuing to the present because of the inability of the heirs of Bessie Smith, the plaintiffs herein, to obtain royalties from the sales of recordings by Bessie Smith, and otherwise to be able to enter into contracts with others with reference to statutory, contract, and other common law rights involving those recordings, and involving the likeliness and image of Bessie Smith.

survived her. Plaintiffs' alternative theory is far more ingenious. It is based on the notion that the contractual discrimination suffered by Smith is a "continuing wrong" to plaintiffs. Since *she* was allegedly defrauded in her various contracts (which governed copyright, performing rights, royalties, *et alia* ), instant *plaintiffs* are foreclosed from signing contracts today which would entitle them to benefits on the renewal of those copyrights, performing rights, royalties, *et alia*. On this theory, plaintiffs are alleging it is *their* § 1981 contractual rights which are implicated, and that they are not suing simply in a representative capacity by virtue of a survival statute, but on their own behalf for wrongs done in the present to themselves.

Defendants' response to the first theory is that while § 1981 causes of action that accrued to Bessie Smith by the time of her death would indeed have survived on behalf of her representatives, the plaintiffs are not those representatives hence are not real parties in interest under Fed.R.Civ.P. 17. Additionally, they rejoin that the statute of limitations period would have permitted suit for six years after her death at most. Plaintiffs counter the statute of limitations point by arguing that any statute of limitations was tolled by defendants' duplicity, and did not begin to run until Chris Albertson revealed that duplicity in 1972 by publishing his biography, *Bessie*.

Defendants' response to the second or continuing wrong theory is that plaintiffs have no standing to proceed. Since it is an alleged contract wrong to Smith that is at the root of the claim, defendants maintain that plaintiffs are attempting to assert her rights vicariously, which they may not do under any of the civil rights acts, including § 1981. We consider first the theory predicated on the survival of causes of action which once belonged to Bessie Smith.

### B. *Survivorship and Suit in a Representative Capacity*

#### 1. *Introduction*

Consideration of plaintiffs' first theory requires the following steps. Initially, we must locate the sources of a) the survivorship statute that will determine which causes of action survive a person's death and who is entitled to bring suit on those causes of action; b) the statute of limitations that will govern the § 1981 claim; and c) the law that will govern tolling of this statute of limitations. In each case, since § 1981 is "deficient in the provisions necessary to furnish suitable remedies," § 1988 instructs us to look to Pennsylvania law, provided that law is "not inconsistent with the Constitution and laws of the United States." *Polite v. Diehl*, 507 F.2d 119, 122 (3d Cir. 1974). The phrase "not inconsistent with" has been recently interpreted by the Supreme Court in *Robertson v. Wegmann*, 436 U.S. 584, 98 S.Ct. 1991, 56 L.Ed.2d 554 (1978).

The appropriate survival statute is 20 Pa. Cons.Stat.Ann. § 3371 (Purdon), which provides:

> All causes of action or proceedings, real or personal, except actions for slander or libel, shall survive the death of the plaintiff or of the defendant, or the death of one or more joint plaintiffs or defendants.

*Robertson v. Wegmann, supra,* held that a Louisiana statute was "not inconsistent" with the broad remedial purposes of § 1983 simply because it provided for survival of certain actions only in favor of certain categories of relatives, rather than decedent's personal representative. Since it was "not inconsistent," the federal district court was bound to employ the statute in the § 1983 action. Employing *Robertson* as a model to determine whether the above survivorship statute is "inconsistent" with the Constitution and laws of the United States, we will find it to be not inconsistent, because it is compatible with the broad remedial purpose of the civil rights acts generally, and § 1981 in particular.

As to the appropriate statute of limitations, defendants agree that that six year Pennsylvania statute found in 12 Pa.Stat. Ann. § 31 (Purdon) is appropriate in the § 1981 action for the reasons set forth in Judge Fogel's opinion in *Jones v. United*

*Gas Improvement Corporation*, 383 F.Supp. 420 (E.D.Pa.1974). The Third Circuit recently decided, in a § 1981 claim, that the underlying type of action must be examined to determine which Pennsylvania statute of limitations is appropriate, and that for a claim of wrongful employment discharge the six year statute is the appropriate one. *Davis v. United States Steel Supply*, 581 F.2d 335 (3d Cir. 1978). In this case many of the claims are basically contractual in nature, although some appear to sound in lost business opportunities, an admixture of tort and property law. We need not, however, decide which statute is appropriate for each. Instead, we will assume the six year statute applies to all aspects of the § 1981 count, since it is the longest one possible under Pennsylvania law. As such, it gives plaintiffs the benefit of any doubt that would be raised by characterizing their various § 1981 claims as essentially "contract" or "tort" or "property" and applying different statutes of limitations to them. Moreover, in this particular case, the discussion of which statute applies is largely academic. Since the claims at issue involve events that transpired over forty years ago, the real issue is not choosing a particular statute, but rather whether any tolling principles may apply.

■ Finally, it seems logical that if Pennsylvania law provides the statute of limitations, Pennsylvania law should also supply the circumstances for tolling that statute, since the tolling provisions are essentially judicial gloss on the statute. This result seems to us compelled by the decision in *Ammlung v. City of Chester*, 494 F.2d 811, 816 (3d Cir. 1974):

> given the absence of a federal limitation period in the Civil Rights Act, the court has no basis for fashioning federal tolling principles, and due regard for our system of federalism requires that state concepts of tolling be applied to state statutes of limitations. . . .

We hold that state tolling principles govern the tolling of the applicable state statutes of limitations in federal civil rights actions arising under 42 U.S.C. § 1983.

We think *Ammlung* dictates the same conclusion in a § 1981 suit. We add the proviso, which we think consistent with the interpretation given *Ammlung* by Chief Judge Lord in *Eubanks v. Clarke*, 434 F.Supp. 1022, 1032 (E.D.Pa.1977), that we are not *foreclosed* from fashioning a federal tolling remedy. But we may only do so if we determine in the first instance that the state remedy mandated by § 1988 and *Ammlung* is "inconsistent" with our Constitution or federal law. We will look first to Pennsylvania law on tolling, and to the extent that law is "inconsistent" with the purposes of § 1981 we will then look to federal common law.

Having identified the appropriate rules to use, we now turn to an examination of the survival statute.

*2. The Survival Statute and the Real Party in Interest Rule.*

■ In applying the survivorship statute of 20 Pa.Cons.Stat.Ann. § 3371 (Purdon), we note first its "derivative" nature:

> The cause of action created by the survival statute is strictly derivative. It is, as it is named, a surviving action. It is grounded upon an existing personal cause of action *which the deceased could have but did not institute during his or her lifetime.*

*Carroll v. Skloff*, 415 Pa. 47, 48, 202 A.2d 9, 10–11 (1964) (emphasis added). Since it applies to all kinds of actions,[10] it must apply to any claims Bessie Smith *might have had* under § 1981 for racially discriminatory contracts at the time of her death in 1937. By operation of law, any such claims may be pursued by, and ultimately redound to the benefit of her estate and thence her heirs. However, a crucial limitation on the survival statute is contained in 20 Pa.Cons.

---

**10.** In 1975 the Pennsylvania Supreme Court ruled unconstitutional the two statutory exceptions in the survival statute concerning libel and slander, *Moyer v. Phillips*, 462 Pa. 395, 341 A.2d 441 (1975).

Stat.Ann. §§ 3372 and 3373 (Purdon); suit may only be brought by the personal representative of decedent, meaning (under 20 Pa.Const.Stat.Ann. § 102), the executor or administrator of the estate. *Burns v. Goldberg,* 210 F.2d 646, 650 (3d Cir. 1954); *Gebhardt v. Edgar,* 251 F.Supp. 678, 680 (W.D. Pa.1966); *Johnson v. Trustees of General Assembly,* 408 Pa. 31, 35, 182 A.2d 724, 726–27 (1962). We cannot ignore this limitation, which is part and parcel of the Pennsylvania survival statute, any more than the district court in *Robertson v. Wegmann, supra,* could rightfully ignore the Louisiana statutory limitation that certain kinds of actions could only survive in favor of certain kinds of relatives. In our case, the executor or administrator of Bessie Smith's estate is not before us. Rather, there is one plaintiff who claims to be her adopted son, and another who is the executor of her *husband's estate.* Neither plaintiff is entitled to avail himself of the Pennsylvania survival statute. This statutory requirement that a surviving cause of action must be brought by decedent's administrator or executor is not a hollow formality. On the contrary, it is the vehicle for insuring that a decedent's assets are fairly and equitably distributed among heirs and creditors. In Pennsylvania, the procedure is governed by Title 20 of the Consolidated Purdons Statutes. These statutory procedures would apply to Bessie Smith's estate by virtue of 20 Pa.Cons.Stat.Ann. § 3151 (Purdon), since it is uncontroverted that she died domiciled in Pennsylvania. For an executor or administrator to be appointed now to administer Bessie Smith's estate, a petition would have to be made for a grant of letters of administration or letters testamentary pursuant to 20 Pa.Cons.Stat.Ann. § 3151 (Purdon). Since more than twenty-one (21) years have elapsed since decedent's death, the Pennsylvania Orphans Court of the appropriate county (*id.* at § 3151) would have to determine if there is sufficient "cause shown" to grant such letters. *Id.* at § 3152.[11]

If the instant § 1981 derivative claim went to trial and were ultimately successful—or if it settled for a monetary amount pre-trial—the proceeds could only benefit Bessie Smith's *estate,* for as stated in *Burns v. Goldberg,* 210 F.2d 646, 650 (3d Cir. 1954) the Pennsylvania survival statute "gave the personal representative a distinct action *on behalf of the estate* . . ." (emphasis supplied). If that happened, and the proceeds were intact after Bessie Smith's creditors, if any, came forward, the Orphans Court would be called upon to distribute them according to her will or the statute of distribution. In doing so, the Orphans Court might have to decide whether Jack Gee, Jr. is in fact the adopted son of Bessie Smith, and hence entitled to take a share of the estate. It would also have to decide whether there are any other heirs of Bessie Smith's now living *not* represented in our lawsuit who are entitled to a statutory share, and whether Jack Gee, Sr.'s heirs (who are represented in our lawsuit) are by law entitled to take from Bessie Smith's estate under the Pennsylvania statute.

Our point is that if, as plaintiffs have asked us to do, we were to waive the requirement that only the personal representative of the *decedent* (here Bessie Smith) has the capacity to sue under Pennsylvania's survival statute, we would be short-circuiting all the orderly legal procedures enumerated above. We, and not the Pennsylvania Orphans Court, would be deciding "cause" exists for granting letters of administration more than 21 years after decedent's death; we would be dispensing with the requirement that a bonded, qualified individual oversee the estate procedure; and most importantly, we would be dispensing with the heart of the survival statute itself, that the causes of action (and therefore all proceeds from successful prosecution of such cause of action) benefit the decedent's *estate.* Such would not be the case in our lawsuit: creditors of Smith's estate would have no opportunity to share in any award, nor would any heirs share in

---

11. If sufficient cause exists, the personal representative would have to provide public notice concerning claims against the estate. *Id.* at

§ 3162. In addition, the personal representative would have to be bonded. *Id.* at § 3171.

any award except instant plaintiffs (if indeed they are her rightful heirs under the distribution statute). Finally, as the last parenthetical pointed out, we would have to make the determination that instant plaintiffs are indeed heirs entitled to inherit by virtue of the Pennsylvania distribution statute (including a determination that Jack Gee, Jr. is actually Bessie Smith's son)—or alternatively, we would have to dispense with the distribution statute entirely and award proceeds to instant plaintiffs regardless of whether they are lawful heirs.

In short, far from being a hollow formality, the requirement that a qualified administrator or executor sue under the survival statute reflects the heart of the statute, which is that a cause of action survives in favor of the decedent's estate. We would be evading and circumventing this core if we permitted instant plaintiffs to be proper parties plaintiff under the survival statute.

We implement these principles in this case pursuant to Rule 17(a) of the Federal Rules of Civil Procedure, which requires that "Every action shall be prosecuted in the name of the real party interest." Wright & Miller instruct that:

> To determine whether the requirement that the action be brought by the real party in interest has been satisfied, the court must look to the substantive law creating the right being sued upon to see if the action has been instituted by the party possessing the substantive right to relief.

6 C. Wright & A. Miller, Federal Practice & Procedure § 1544 at 647 (1971).

■■■ The "substantive law creating the right being sued upon" in our case is the Pennsylvania survival statute. (In the related *Erie* context, Wright & Miller observe that the survival statute is indeed substantive, and not procedural. *Id.* § 1952 at 642.) Under that statute only the personal representative of decedent is entitled to institute and maintain a survival suit. Accordingly, we conclude that the real party in interest is not before us, and that Count I must be dismissed because Rule 17(a) has not been complied with.

■■■ Rule 17(a) prohibits dismissal of an action solely on the grounds that the real party in interest is not a party to the action. Accordingly, we would normally grant plaintiffs leave to amend to substitute Bessie Smith's personal representative as plaintiff. In this case, however, we do not do so for two reasons. First, as will appear, we find that the § 1981 action is conclusively barred by the statute of limitations. Therefore, permitting substitution of the personal representative at this time would not avail plaintiffs in the disposition of this claim. Under these circumstances, we see no reason to grant leave to amend under 17(a). *See* Wright & Miller, *supra*, § 1555: "The rule [calling for substitution rather than dismissal] should be applied only to cases in which substitution of the real party in interest is necessary to avoid injustice." *Id.* at 707. Alternatively we could deny plaintiffs' leave to amend because they have already amended their complaint twice; i. e., they have had "three strikes" and to give them a fourth opportunity to get their pleadings in order goes beyond the pale of justifiable judicial indulgence.[12]

3. *The Statute of Limitations and the Matter of Tolling*

(a) *Introduction*

Even if there were no real party in interest objection, we would still confront the

---

[12]. The law is well settled that a Court may deny leave to amend pleadings if a party has had sufficient opportunity to state a claim and has failed. *See generally* 3 Moore's Federal Practice ¶ 15.08(4) at 15–94, n.11 and accompanying text (2d ed. 1978).

In *Foman v. Davis*, 371 U.S. 178, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962), the leading case on amendment, the Court noted that in the proper exercise of discretion, the trial judge may deny leave to amend after repeated failure to cure deficiencies by amendments previously allowed. *Id.* at 182, 83 S.Ct. 227. In *Thomas v. Amerada Hess Corp.*, 393 F.Supp. 58, 78 (E.D. Pa.1975) our colleague Judge Bechtle similarly concluded, and exercising his discretion, denied leave to amend further. *See also Mooney v. Vitolo*, 435 F.2d 838 (2d Cir. 1970), where plaintiffs were twice given an opportunity to replead. The plaintiffs still failed to state a claim on which relief could be granted, and it was held to be within the sound discretion of the district court to deny leave to replead on the third attempt. *Id.* at 839.

enormous obstacle of the statute of limitations. The statute of limitations defense to the § 1981 claim, as well as to the other counts, is obviously of critical significance in a lawsuit based on events which occurred between 1923 and 1933. Applying the six year statute of limitations found in 12 Pa. Stat.Ann. § 31 (Purdons) means that suit should have been brought on the *last* of these contracts by 1939 at the latest. Since Bessie Smith died in 1937, the executor or administrator of her estate would have had to have brought suit within two years of her death. Thus the crucial question before us is that of the tolling of the statute.

We turn to the (second) amended complaint. The following allegations are the only ones which could conceivably affect the running of the statute of limitations:

9. Bessie Smith recorded 180 songs for Columbia Records from 1923–1933, of which, on information and belief, 20 were never released at that time or since, and the maters are now lost. Because she was an "exclusive artist" for Columbia, Bessie Smith's total recorded output, with one exception, was recorded under the Columbia label, with her last 4 sides in 1933 being issued on the Okeh label, a Columbia subsidiary corporation. Her records were and are also issued worldwide during her lifetime and to the present, under various labels of Columbia subsidiaries, affiliates or licensees.

11. Bessie Smith was born in Chattanooga, Tennessee, between 1895 and 1900. She did not have any formal education. For all of her unparalleled musical talents, she was nevertheless unsophisticated and ignorant in legal and financial matters and was easily taken advantage of by those who managed her business and financial affairs.

12. In June 1923, Bessie Smith married Jack Gee (Sr.) [who] . . . finished only a couple of years of grade school and was unable to read or write for his entire life. . . .

14. In 1923 Frank Walker was then Director of Recording for Columbia Records and sought to initiate Columbia's 'Race Record' series, a new venture for the company which had gone bankrupt the year before.

17. When Bessie went to Frank Walker's office after obtaining contractual releases from [former manager Clarence] Williams, Walker offered her an exclusive contract with Columbia for a one-year contract commencing April 20, 1923. The contract required Bessie to record 12 selections at $125 per usable side. It guaranteed her $1500 and included a 1 year renewal option for 12 sides at $150. Because Williams had not yet received her fee for 4 sides made during April, Walker gave Bessie a check for $500. Walker struck out the royalty clause in the contract, thus making a lucrative deal for Columbia. Because neither Bessie nor Jack were aware of such things as royalties, they felt that Walker was generous with her and Bessie appointed him her manager.

18. Frank Walker, Columbia Record executive, served also as Bessie's manager until the late 1920's for all purposes, and until 1931 for her recording dealings. While Walker may not have personally benefited financially, while serving in this conflicting role, he took advantage of Bessie's color and ignorance and he made Columbia Records rich through Bessie's efforts, and made others like Clarence Williams, rich as well. Bessie's later recording arrangements with Columbia were made on her behalf by Walker, and even at her prime in the middle 1920's, Bessie never received more than a maximum of $200 flat fee per selection with no royalties. This small flat fee per selection arrangement with no royalties was part of a pattern and practice of race discrimination by Columbia Records and its officers to exploit black artists who were recording "exclusively" and otherwise for Columbia's race record series. Only white artists and others who were sophisticated in entertainment law were given substantial sums per selection, or a royalty package by Columbia.

19. By way of contrast, in 1925 when Bessie was the top black entertainer in

the country, and a recognized superstar, and when her records had already outsold those of any other Columbia artist—white or black who preceded her—Bessie, through Frank Walker (Columbia's Recording Director and simultaneously her manager) was receiving a flat fee of $200 per selection with no royalties as an "exclusive artist" for Columbia. In that same year, 1925, Phonofilm publicity announced that Al Jolson had received $15,000 for 2 sides from Brunswick Records, and that he received $10,000 for a single song on Phonofilm. White artists who were then recording for Columbia at about this time such as Eddie Cantor, Ted Lewis, Ruth Etting, Paul Whitman, Rudy Vallee, Sophie Tucker, Bing Crosby, Kate Smith, Blossom Seely, and others, were on information and belief, all receiving very substantial fees per selection or else receiving a royalty arrangement, even though Bessie Smith record sales were outstripping theirs.

20. Moreover, Bessie Smith authored and composed many of her own songs which she recorded for Columbia. On information and belief, as a routine matter, Frank Walker entered into copyright license agreements for Columbia to record these tunes, by signing such agreements "Frank Walker for Bessie Smith." These agreements paid no or nominal payments by Columbia to Bessie for the privilege of recording her copyrighted songs. On information and belief, Bessie never received any sums from Columbia under such purported agreements.

21. On information and belief, Jack Kapp, a Columbia Records official during the period when Bessie was recording, paid Bessie a few dollars for her tunes during the regular course of business with Columbia. He would then copyright the tunes under a dummy publishing company and collect royalties himself, at the expense of Bessie. On information and belief, these activities, were carried on with the actual and constructive knowledge of Columbia and no reasonable payment or accounting to Bessie or her heirs has ever been made as a result of these activities.

22. In 1933, Bessie recorded her last 4 selections for Columbia, which were later issued on the Okeh Record label, a Columbia subsidiary which made a lower priced record produce which sold for 35¢ in contrast to the usual 75¢ for a Columbia single. John Hammond, while an official of Columbia, made financial arrangements on Bessie's behalf for this recording session and paid Bessie $37.50 per selection or a total of $150 for the 4 sides pursuant to a verbal contract. While Hammond did not personally benefit financially while serving simultaneously in the conflicting positions of Columbia executive and agent for Bessie Smith with respect to the 1933 78 rpm recordings, these recordings were sold at a profit by Columbia and were subsequently re-issued and re-recorded in LP 33⅓ albums many years later with a major profit being reaped by Columbia as a result thereof, for which no further monies or accounting has ever been paid to Bessie, or her heirs.

23. From the limited discovery to date and from the contentions of defendants, Bessie Smith was supposed to have entered into the following contracts with Columbia for her artistic recording efforts:

| Date of Contract | Period | Terms |
|---|---|---|
| (a) approx. February, 1923 | 2/16/23–4/20/23 | $125 flat fee per selection. Royalties for records sold: NONE. Copyright royalties for authoring or composing tunes: NONE. |

On information and belief, plaintiffs aver that Bessie signed no contract with Columbia but a contract was signed or implied without Bessie's consent, but with collusion of Walker and Columbia, between Clarence Williams, Manager for Bessie Smith and Columbia providing for the payment to Bessie, c/o Clarence Williams of a flat fee of $125 per selection.

During the period of this self-appointed collusive managerial contract, Bessie recorded some of her most important records including:

| | |
|---|---|
| Down Hearted Blues | 2/16/23 |
| Gulf Coast Blues | 2/16/23 |
| Aggravatin Papa | 4/11/23 |
| Beale Street Mama | 4/11/23 |
| 'Taint Nobody's Business If I Do | 4/11/23 |
| Keeps on A-Rainin | 4/11/23 |
| Baby Won't You Please Come Home Blues | 4/11/23 |
| Oh Daddy Blues | 4/11/23 |

Columbia ledger sheets for this time period do not reflect any recording contract under Bessie Smith's name, and defendants have produced none.

| Date of Contract | Period | Terms |
|---|---|---|
| (b) 4/20/23 | 4/20/23–4/20/24 1 year, with 1 year renewal option on same terms by Columbia | Exclusive Artist 12 songs at $125 each, with $1500 guarantee Royalties for records sold: NONE. Payment to Bessie as song composer or author (copyright owner) for right to make records: NONE |
| (c) 12/22/23 (revision of preceding contract) | 12/22/23–1/22/25 with 1 year renewal option on same terms by Columbia | Exclusive Agent 12 songs at $200 each with $2400 guarantee Royalties on records sold: NONE Payment to Bessie as song composer or author for right to make records: NONE |
| (d) 12/22/23 (renewal option exercised) | 1/22/25–1/22/26 | Same terms. |
| (e) 1/22/26 | 1/22/26–3/16/27 with 1 year renewal option on same terms by Columbia | Exclusive Artist 12 songs at $200 each, with no guarantee Royalties on records sold: NONE Payment to Bessie as song composer or author, for right to make records: reserved to artist |
| (f) 1/22/26 (renewal option exercised) | 3/16/27–4/9/28 | (same terms) |
| (g) 4/9/28 | 4/9/28–9/5/29 | Exclusive Artist 12 songs at $200 each, with no guarantee Royalties on records sold: NONE Payment to Bessie as composer or author, for right to make records: reserved to artist. Columbia has radio broadcasting rights without payment. |
| (h) 7/11/30 | 7/11/30–8/11/31 (contract not renewed at end of term) | Exclusive Artist 12 records at $125 each, $1500 guarantee Royalties on records sold: NONE Payment to Bessie as composer or author, for right to make records: NONE |

| Date of Contract | Period | Terms |
|---|---|---|
| (i) 11/24/33<br>(verbal contract with<br>John Hammond,<br>officer of Columbia) | 11/24/33 | 4 sides at $37.50 each, for total of $150<br>Royalties on records sold: NONE |

24. On information and belief, while Columbia ledger sheets show the existence of such contracts from April 20, 1923 to August 11, 1931, plaintiffs aver that Bessie Smith neither saw nor signed any written contracts with Columbia for this period. Columbia has not produced any such contracts, or any copy thereof. Columbia has produced 3 unsigned form contracts, which Columbia claims were effective between Bessie and Columbia for the period of January 22, 1926 to August 11, 1931. On information and belief, if any such contracts existed in writing or prior thereto between Bessie Smith and Columbia, plaintiffs aver that they were signed "Frank Walker for Bessie Smith" or the equivalent, without Bessie Smith's knowledge or consent but with the collusion, approval and acquiescence of Columbia, as was customary by Columbia with respect to "race record" recording artists.

25. On information and belief, copyright contracts giving rights to Columbia to record songs authored or composed by Bessie Smith without payment to Bessie Smith, or in return for a nominal payment, were routinely signed "Frank Walker for Bessie Smith" without her knowledge or consent and with the collusion, approval and acquiescence of Columbia, as was customary.

26. Bessie Smith never had a royalty agreement with Columbia during all of her smash hit years as an Exclusive Artist. Bessie received a total of $28,575, "a fraction of what many young performers of lesser talent receive on signing a recording contract today."

29. During the course of Bessie Smith's life, and continuing thereafter to the present, Columbia has misrepresented to the world that Columbia is the exclusive property owner of all rights, title and interest to Bessie's recordings. In 1951, when Columbia re-recorded and re-issued a four long-playing record album series of Bessie Smith's stories, the liner notes for Volume I, The Bessie Smith Story, prominently state, "She [Bessie] left behind her 160 recordings (every one of them, incidentally, the property of Columbia Records)." Similar representations are made in other literature and liner notes disseminated by Columbia. Until his death in 1973, Jack Gee (Sr.) was unable to read or write. During his lifetime, Columbia had never revealed to him, nor did he have access to any information concerning the defendants' activities in fraudulently misappropriating the personal and property rights of his wife, Bessie Smith. Jack Gee, Jr., son of Bessie Smith, was a minor at the time of Bessie's death in 1937. Upon his inquiry in later years, his father Jack Gee, Sr. advised him that he, Jack Gee, Sr., was taking care of all of the rights flowing from Bessie's estate. Jack Gee, Sr. and Jack Gee, Jr. did not get along well, with Jack Sr. often placing Jack, Jr. in various homes and institutions during Bessie's life, and thereafter communicating infrequently with him. In any event, by virtue of defendants' concealment activities, and Jack Gee, Sr.'s illiteracy, plaintiffs had no knowledge and could not have reasonably obtained any knowledge of defendants' unlawful activities as aforesaid, or of any fact which might have led to the discovery thereof, until the publication of the biography of Bessie Smith by Chris Albertson by Stein & Day Publishers in 1972. The author had special access to archive records of Columbia that were not generally available to the plaintiffs. Plaintiffs could not have discovered the unlawful activities of defendants at an earlier date by the exercise of due diligence, since the unlawful activities as set

forth herein had been fraudulently concealed by the defendants by various means and methods to avoid their detection.

30. In 1974, Bruce Lundvall, President of Columbia, appeared live on a public television program and he re-affirmed earlier and continuing obligations of Columbia to Bessie Smith and her heirs. Mr. Lundvall stated with respect to the re-recordings of Bessie's songs in five double album sets in 1970 to 1972, that "There was a royalty paid, a payment made to the Bessie Smith Foundation . . . . We made one payment initially, but the royalties have accumulated in an account and will be used for a fund for needy black students in the future . ." No payment or accounting to the plaintiffs has ever been made by Columbia, in connection with any accumulated "royalties" by Columbia with respect to record sales from the 1970–72 album series, and after demand, Columbia has refused to make any such payments to plaintiffs. In a recent annual report to shareholders, Columbia referred to the Bessie Smith re-issues as the biggest-selling re-issues in the history of the record industry, and on information and belief gross sales to Columbia of the re-issues are currently in excess of $6 million.

We consider all the foregoing allegations to bear upon the statute of limitations questions in the § 1981 claim since it is broadly asserted that the § 1981 claim applies to *every* contract Bessie Smith actually entered into with Columbia Records or might have entered into but for racial discrimination, including, *inter alia*, contracts for royalties and flat fees on recorded performances, those for royalties and flat fees on compositions which she actually did or might have copyrighted, and those for use of her name and likeness. The question before us is whether the allegations we have enumerated above are sufficient, under the Pennsylvania law we are bound to apply by virtue of 42 U.S.C. § 1988 and the Third Circuit's *Davis v. United States Steel Supply* and *Ammlung* decisions, to toll the six year statute of limitations which would

have long since run on all the events transpiring between Bessie Smith and Columbia Records between 1923 and 1933.

■■■ As we understand the case law, there are several separate inquiries we must make under facts as alleged here. The first is whether the *underlying events* being sued upon—here, the course of dealings between Bessie Smith and Columbia Records during 1923–33—sound inherently in fraud or deceit. If they do then that, without more, will toll the statute of limitations until such time as the fraud has been revealed, or should have been revealed by the exercise of due diligence by plaintiffs. This doctrine finds expression in Justice Frankfurter's opinion in *Holmberg v. Armbrecht*, 327 U.S. 392, 397, 66 S.Ct. 582, 585, 90 L.Ed. 743 (1946):

> [T]his Court long ago adopted as its own the old chancery rule that where a plaintiff has been injured by fraud and remains in ignorance of it without any fault or want of diligence or care on his part, the bar to the statute does not begin to run until the fraud is discovered, though there be no special circumstances or efforts on the part of the party committing the fraud to conceal it from the knowledge of the other party.

*Holmberg* is based on the premise that fraud as a common-law cause of action is self-concealing by its nature. Its elements were stated nearly a century ago as:

> *First.* That the defendant has made a representation in regard to material *fact*; *Second*, that such representation is false; *Third*, that such representation was not actually believed by the defendant, on reasonable grounds, to be true; *Fourth*, that it was made with intent that it should be acted on; *Fifth*, that it was acted on by complaint to his damage; and *Sixth*, that in so acting on it the complainant was ignorant of its falsity, and reasonably believed it to be true.

*Southern Development Co. v. Silva*, 125 U.S. 247, 8 S.Ct. 881, 31 L.Ed. 678 (1888), *quoted in* 2A *Moore's Federal Practice,*

¶ 9.03 at 1923 (2d ed. 1978).[13]  As long as plaintiff continues to reasonably rely to his detriment on the knowingly misleading representation the fraud continues, and of necessity it is concealed from plaintiff.  No additional special efforts of concealment are then necessary.

Pennsylvania case law has worked a slight modification on the *Holmberg* doctrine.  In *Nesbitt v. Erie Coach Company,* 416 Pa. 89, 204 A.2d 473 (1964), the Pennsylvania Supreme Court announced that the fraud or deceit necessary to toll the statute of limitations "does not mean fraud in the strictest sense encompassing an intent to deceive, but rather fraud in the broadest sense which includes an unintentional deception."  *Id.* at 96, 204 A.2d at 476.  It is also clear that under Pennsylvania law there must be a misrepresentation of material fact.  *See* in *Guy v. Stoecklein Baking Co.,* 133 Pa.Super. 38, 1 A.2d 839 (1938).  Apparently the Pennsylvania rule is that once plaintiff has shown that such a misrepresentation has occurred, and that he reasonably relied to his detriment on it, he need not also show the opposing party intended he should act on it; the fact that he did so is a sufficient showing.  In terms of the elements of fraud enumerated in *Southern Development Co., Nesbitt* and *Guy* apparently eliminate element number four—the requirement that the misrepresentation was made with intent that it should be acted on.  None of the other elements is affected by *Nesbitt* and *Guy* ; all are necessary to show fraud sufficient to toll the statute of limitations.  Furthermore, under the Pennsylvania view, the showing that must be made to invoke fraud as a grounds for tolling the statute requires particularity: "an estoppel becomes operative only in *clear cases* of fraud, deception or concealment."  *Walters v. Ditzler,* 424 Pa. 445, 449–50, 227 A.2d 833, 835 (1967) (emphasis in original).

Under *Holmberg* and *Nesbitt* then, our first line of inquiry is whether the facts alleged concerning the transactions between Bessie Smith and Columbia from 1923 to 1933 constitute either "intentional" or "unintentional" fraud.  If so, we must determine when the fraud ended, or whether it is alleged to have continued unabated to the present.

Our second line of inquiry involves the doctrine of "fraudulent concealment."  Fraudulent concealment does not depend, as do *Holmberg* and *Nesbitt,* on the underlying cause of action—here the 1923–1933 transactions—being inherently fraudulent.  Rather, it requires independent acts of "fraudulent concealment" of the events or circumstances constituting the underlying cause of action, irrespective of whether those underlying events are inherently fraudulent or not.  *See* Dawson, *Fraudulent Concealment and Statutes of Limitations,* 31 Mich.L.Rev. 875 (1933).  This doctrine, as explicated by Judge Goodrich in *Overfield v. Pennroad Corporation,* 146 F.2d 889, 896 (3d Cir. 1944), finds expression in Pennsylvania case law:

> The plaintiffs say, however, that there was concealment and such concealment would toll the running of the statute under Pennsylvania law.  We are confronted at the outset, however, with the proposition, laid down over and over again in the Pennsylvania decisions that the concealment which tolls the statute must be an affirmative, independent act of concealment; mere silence or nondisclosure, even by corporate officials is not enough.  The time at which it takes place is immaterial: whether before, contemporaneous with or subsequent to the act complained of.  But independent act, "affirmative efforts to divert, mislead, or prevent discovery" there must be.  We do not see here any such conduct independent of the very things about which the plaintiffs complain.  The plaintiffs complain of investments and say that they were made with an eye not to Pennroad's interest, but that of the Pennsylvania

---

**13.**  *See also* W. Prosser, *Torts* § 105 at 685 (4th ed. 1971); L. Loss, *Securities Regulation* at 1431 (2d ed. 1969).

Railroad. But the sum and substance of that complaint is a series of transactions which alone make up the gravamen of the alleged offenses. We see no independent acts, designed to "divert, mislead, or prevent discovery."

(citations to Pennsylvania case law omitted). Nearly thirty years later Judge Gibbons affirmed the correctness of *Overfield*'s statement of the Pennsylvania law by citing it as the "governing standard" in *Knuth v. Erie-Crawford Dairy Cooperative Ass'n.*, 463 F.2d 470, 482 (1972). Judge Gibbons emphasized that there must be an "affirmative effort . . . to conceal." *Id.* at 482.

█ In sum, the "fraudulent concealment" doctrine directs our attention to the following question: even if none of the transactions between Columbia Records and Bessie Smith between 1923 and 1933 involved inherent fraud, was there a subsequent "affirmative effort to divert, mislead, or prevent discovery," so as to constitute "fraudulent concealment" sufficient to toll the statute of limitations? [14]

Plaintiffs' third basis for tolling the statute of limitations consists of the allegations that Frank Walker and John Hammond served in conflicting roles as Smith's agents and as officials for Columbia in negotiating and executing Smith's recording contracts, to her financial detriment. In plaintiffs' view, the "breach of fiduciary duty" resulting from these conflicting roles, and mani-

fested in allegedly pro-Columbia Records recording contracts, stops the running of the statute.

Plaintiffs' fourth basis for tolling is found in ¶ 34, alleging that Bruce Lundvall "revived" the contract actions underlying the § 1981 claim in 1974 by publicly acknowledging the existence of money owed to Bessie Smith.

We examine the sufficiency of the allegations to support each of the above four theories of tolling *seriatim*. In each case, we read the complaint in the context of the instruction of *Conley v. Gibson*, 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957) that we construe the allegations in the light most favorable to plaintiffs. In the case of (b) and (c) *infra* (inherent fraud and fraudulent concealment) we also read the complaint bearing in mind the salutary provision of Fed.R.Civ.P. 9(b) that "In *all* averments of fraud . . . the circumstances constituting fraud shall be stated with particularity." (Our emphasis). This requirement would be necessitated in any event by the holding of *Walters v. Ditzler, supra*, that "an estoppel becomes operative only in *clear* cases of fraud, deception, or concealment."

(b) *The Doctrine of Inherent Fraud: The Existence of Fraud in the Underlying 1923–33 Transactions Between Bessie Smith and Columbia Records*

Our starting point under this theory is whether any of the facts as alleged concern-

---

**14.** A logical next question under the "fraudulent concealment" doctrine is prevent "discovery" of *what*? The cases addressing the Pennsylvania statute of limitations disclose some subtle nuances as to whether the matter that must be concealed is "factual" or "legal," or some admixture. Judge Luongo in *Getz v. Bruch*, 400 F.Supp. 1033 (E.D.Pa.1975) found that under Pennsylvania law, the statute runs from the time when plaintiff discovers or could have discovered the "operative facts; " he need not know that those facts create a legally-protected right of redress. Judge Gorbey held in *Huber v. McElwee-Courbis Construction Co.*, 392 F.Supp. 1379 (E.D.Pa.1974), that, in the context of medical malpractice, a plaintiff must have been able to discover "the cause of his injuries" but not whose "negligence or breach of duty" was responsible for those injuries. Judge Grim, in *Girsh v. Girsh*, 222 F.Supp. 901 (E.D.Pa.1963) implied that what had to be dis-

covered were facts sufficient to draft a complaint, which would invoke a legal sufficiency notion under Fed.R.Civ.P. 8. Judge Clary in *Philco Corporation v. Radio Corporation of America*, 186 F.Supp. 155 (E.D.Pa.1960) found that simultaneous discovery of facts *and* that those facts constituted a cause of action was more than sufficient to preclude tolling, without reaching the question of what would have constituted minimally sufficient discovery. See also *Kubrick v. U. S.*, 435 F.Supp. 166 (E.D.Pa. 1977), *aff'd* 581 F.2d 1092 (3d Cir. 1978), *cert. granted* —— U.S. ——, 99 S.Ct. 1211, 59 L.Ed.2d 453, (1979).

In our case, since, as appears *infra*, we find no affirmative efforts to mislead by defendant, we need not address the question whether, had there been such efforts, when they would have terminated by virtue of plaintiff discovering, or being able to discover operative "facts" or "law" or a suitable admixture thereof.

ing the original course of dealings between Bessie Smith and Columbia Records constitute fraud in the *Nesbitt* sense. We refer here to ¶¶ 11, 12, 14, 17, 18, 19, 20, 21, 22, 23, 24, 25, and 26 of the complaint.

Paragraphs 11 and 12, which relate to the lack of education and sophistication of Smith and Jack Gee, Sr., might be relevant if a subjective standard for deception were used, because they could help demonstrate that Bessie Smith was in fact misled. However, the appropriate standard is an objective or reasonable person one, *see* p. 626 *infra,* so these allegations are not relevant to our inquiry.

Paragraphs 14, 17, 18 and 19 together allege that while Frank Walker served in a dual capacity as record company official and agent, he signed Bessie Smith to contracts. Plaintiffs admit Smith was paid the amounts indicated in the recording contracts, *i. e.,* the allegedly "small" flat fee payments. (". . . even at her prime . . . Smith never received more than a maximum $200 flat fee per selection with no royalties." ¶ 18). These paragraphs also contain the allegation Walker struck out the royalty provision in the form contracts to which he signed Smith's name. We cannot find any allegations of inherent fraud in these paragraphs. We infer that Smith must have been aware of the amounts she actually received. There is no allegation that she was misled, for example, by being induced to believe she was going to be paid royalties when in fact she wasn't. Quite the contrary, Frank Walker is alleged to have crossed out that provision, conforming the form contract with the reality of her apparently oral contractual arrangement. Paragraph 18 simply states that Bessie was paid less than white performers because of racial discrimination. There is no allegation that she was deceived or misled in any fashion. Reading ¶¶ 17 and 18 together, the most that can be inferred is that Bessie Smith was *not told* that such things as royalties were possible to receive. Such

nondisclosure is categorically different from common law fraud, which requires a "false *representation* of a material fact." [15]

Nor can these allegations suffice to allege fraud under the "unintentional fraud" formulation of *Nesbitt.* In that case, as in *Guy v. Stoecklein Baking Co., supra,* and in every other case in Pennsylvania we have reviewed, the predicate for even considering whether "unintentional fraud" exists is an actual misrepresentation of a material fact. We cannot find any such misrepresentation alleged in ¶¶ 14, 17, 18, or 19, whether read singly or together. As to whether these allegations state a valid § 1981 claim, we express no opinion at this juncture. But they are manifestly insufficient to allege the kind of inherent fraud necessary to toll the statute of limitations.

As for paragraph 20, at first blush it sounds as though Smith was defrauded with respect to copyrights owned by her, *i. e.,* that she held the copyrights, and that in executing licensing agreements to make records derived from these copyrights, Columbia fraudulently signed her name without paying her any licensing proceeds. Crucially, however, paragraph 20 fails to allege that Bessie Smith *owned* any of the copyrights which Columbia Records licensed. The only phrase suggesting she (as opposed to someone else) owned any copyrights is contained in the ambiguous phrase "her copyrighted songs." The confusion is augmented by reading ¶ 20 along with ¶ 21, the latter of which she clearly states she *didn't* own copyrights. However, bearing in mind the mandate of *Conley v. Gibson, supra,* and giving full rein to the federal rules' permission for inconsistent pleadings, we give plaintiffs the benefit of any doubt and construe the pleadings to allege that she did own at least some copyrights. This is the first allegation we can infer to even remotely sound in fraud.

Paragraph 21 itself contains no allegation of fraud  It simply states that

---

**15.** Mere nondisclosure might be enough if there were a preexisting duty to inform Smith of white performers' salaries and/or the existence

of royalty arrangements. We consider this possibility in our discussion of agency relationship, *infra.*

Bessie Smith sold the copyrights to songs she composed to a Columbia subsidiary. There is no allegation that the subsidiary or Columbia made a knowingly false representation on which she justifiably relied to her detriment. The allegations in paragraph 21 may well state a valid claim under the substantive law of § 1981, the copyright laws or appropriate state law protecting property. We express no opinion on those questions here. We simply note that ¶ 21, like ¶¶ 17 and 18, does not describe any inherently fraudulent activity, as that term is defined to determine the statute of limitations issue.

■ The facts alleged in ¶ 22 do not constitute fraud any more than do those in ¶¶ 17, 18, or 21. They say only that she was paid too little (in relation to what she potentially could have commanded with the help of a devoted agent) for her recordings. Smith clearly was paid the money, and clearly must have known how much she was paid. There is no allegation of any attempt to pretend to pay her more than she actually received. At most, it alleges nondisclosure of how much other performers were earning, which may or may not be an actionable wrong under various laws, but which is not common law fraud.

■ Paragraphs 23 and 24 allege that there exist a number of form contracts Smith neither saw nor consented to, but to which her name was signed by her agent who was simultaneously a Columbia official. The Columbia executive is not alleged to have forged her name. Rather he signed them in his name "for Bessie Smith." According to the allegations and plaintiffs' motion papers, Columbia paid Smith the amounts stated in the contracts, (with the possible exception of eight songs discussed in Part V of this opinion) and reflected those amounts in its ledger book. We can find no element of fraud here.

Finally, ¶ 25 seems to contain exactly the same allegations as ¶ 20: that Bessie Smith owned copyrights (this is nowhere clearly stated in ¶ 25, just as it was not in ¶ 20), and that Columbia defrauded her out of licensing proceeds by signing her name as copyright holder and licensor to licensing contracts with Columbia as licensee. We construe ¶¶ 20 and 25 together as one allegation, and it is the *only* allegation we can discern in this complaint that in any way suggests inherent fraud in the 1923–33 course of dealings between Bessie Smith and Columbia Records.

In sum, none of the allegations allege inherent fraud with any cogency or specificity as demanded by Fed.R.Civ.P. 9(b) and the Pennsylvania case law on tolling the statute of limitations. The only allegations we can even construe to sound in fraud are those contained in ¶¶ 20 and 25. As to those allegations (which we can only read as in reality the same allegation stated twice), our next inquiry under *Holmberg* is whether the fraud is alleged to have concealed itself by reason of its inherent nature from the 1920's to the 1970's, without the reasonable possibility of detection.

■ Turning to that inquiry we cannot find, and cannot reasonably construe, any allegation which would support the proposition that a scheme to defraud Bessie Smith between 1923 and 1933 (by obtaining licensing agreements to songs of which she was the copyright holder by signing her name to the agreements and not paying her licensing fees, as alleged in ¶¶ 20 and 25) was inherently self-concealing until the 1970's. Quite the contrary, the only reasonable inference we can draw is that if Bessie Smith were indeed the copyright holder, she knew, or *should have known*, that certain legal rights, including the rights of licensing, were hers by virtue of those copyrights. We are precluded from drawing any other inference because, under the allegations of the complaint, she recorded those very songs she composed (and for which by hypothesis she held the copyright) for Columbia, and she had to know Columbia was making the records and releasing them to the public for sale. The applicable legal standard is that inherent fraud continues to be concealed as long as the person defrauded "ha[s] failed in [the exercise of] *reasonable diligence* to discover" the alleged deception. *Holmberg v. Armbrecht*, 327 U.S. 392,

397, 66 S.Ct. 582, 585, 90 L.Ed. 743 (1946) (emphasis added); "In Pennsylvania . . . the statute of limitations is deemed to run . . . . from the time of discovery of the fraud *or facts which would lead a reasonable man to discovery of the actual fraud.*" *Tober v. Charnita, Inc.*, 58 F.R.D. 74, 84 (M.D.Pa.1973) (emphasis added). It is impossible for us to conclude that Bessie Smith, acting with due diligence under *Holmberg* or as a reasonable person under *Tober*, would not or should not have discovered the kind of fraud alleged in ¶¶ 20 and 25. If there are facts about the scheme which would make it self-concealing from the 1920's until the 1970's, without the reasonable possibility of detection, they have not been set forth in plaintiffs' pleadings or response to Columbia's motion for summary judgment. And we must categorically reject the possibility that the ignorance and lack of business sophistication alleged in ¶¶ 11 and 12 is legally sufficient to "conceal" the fraudulent scheme for more than forty years. Ignorance on the part of Bessie Smith or her husband is simply different from concealment by defendants. And the case law requires an objective, or reasonable person standard, not a subjective one. *See Holmberg v. Armbrecht* and *Tober v. Charnita, Inc., supra.* We conclude that plaintiffs have not made specific and legally sufficient allegations of inherent fraud to warrant tolling the statute of limitations from the 1930's to the 1970's.

(c) *The Doctrine of Fraudulent Concealment*

We turn, then, to the alternative possibility—not that the original transactions between 1923 and 1933 were inherently fraudulent and hence concealed by their own nature, but that, under *Overfield* and *Knuth*, there were "affirmative efforts to divert, mislead, or prevent discovery" as opposed to "mere silence, or nondisclosure, even by a corporate official." *Overfield, supra,* 146 F.2d at 896.

For this inquiry, we focus on ¶¶ 14 through 25 *as read with* ¶ 29—the former provide the matter concealed, the latter contains all the allegations bearing on Columbia's efforts of "fraudulent concealment." We note preliminarily that ¶ 15, involving the allegations about Clarence Williams, cannot form the basis of any "fraudulent concealment" theory. The complaint itself alleges that Jack Gee "learned that spring" [1923] of Williams's activities and that "Jack Gee and Bessie Smith forthwith fired Williams as Bessie's manager after a confrontation meeting in April, 1923."[16] These allegations clearly demonstrate the exact opposite of "concealment," fraudulent or otherwise.

Focusing on ¶ 29, we do not find any allegations of any affirmative, independent acts of concealment, or of anything more than mere corporate silence by defendants. Plaintiffs apparently ask us to infer from the 1951 publication by Columbia, in which it represented it owned the rights to Smith's recordings, that plaintiffs justifiably relied on this representation (or what plaintiffs contend is a misrepresentation) and that they therefore understandably let down their guard. The short answer is that this is simply not the kind of "concealment" *Overfield* and *Knuth* contemplate. On the contrary, we can only construe this publication by Columbia as the opposite of concealment, and it should have put anyone who thought he might have a legal entitlement to Bessie Smith's recordings on notice to investigate further.

Turning to the allegation in ¶ 29 that Columbia "had never revealed" to Jack Gee, Sr., its "misappropriating" of his wife's property, this is clearly insufficient as an allegation of concealment under *Overfield.* It is simply "non-disclosure . . . by a corporate official." And the gratuitous reference in ¶ 29 to nature of the relationship between Jack Gee, Jr. and Jack Gee, Sr. is legally irrelevant in this lawsuit, since there is no allegation that Columbia took advan-

---

**16.** Albertson sheds a bit more light on the "confrontation." According to his account, Williams was assaulted and beaten up.

tage of this relationship to actively conceal anything from anyone.

■ That leaves two allegations in ¶ 29. The first concerns Jack Gee Sr.'s illiteracy. This is the same allegation contained in ¶ 11. There is no allegation that Columbia actively took advantage of Gee's illiteracy in any fashion. Perhaps this circumstance would have made concealment *easier* had there been other attempts to conceal, but since there has been no other concealment alleged, his illiteracy is insufficient standing alone.

■ The final allegation is that Columbia used "various means and methods" to work a concealment until 1972 (when Chris Albertson published *Bessie*).' The Fed.R.Civ.P. 9(b) requirement is that "In *all* averments of fraud . . . the circumstances constituting fraud . . . shall be stated with particularity." This rule must apply fully to the doctrine of "fraudulent concealment" as a tolling principle. The phrase "various means and methods" is precisely the vague pleading that 9(b) was drafted to prevent. Rule 9(b)'s "particularity" requirement is wholly salutary in view of the free abandon with which the term "fraud" is prone to be used. The salutary character of the rule is especially apparent in our situation, where the existence of "fraud" (*i. e.* fraudulent concealment) will determine not simply whether defendant will be summoned to stand trial, but whether defendant will have to stand trial concerning events that happened more than forty years ago. Where, as here, the presence or absence of fraud is not simply the basis of a cause of action which has been timely commenced, but rather is the very precondition for tolling the statute of limi-

tations and examining a cause of action which has lain dormant for nearly half a century, it is especially important that the requirements of Rule 9(b) be met. Plaintiffs have not done so.[17]

We conclude, therefore, that plaintiffs have not made specific and legally sufficient allegations of "fraudulent concealment" to warrant tolling the statute of limitations from the 1930's until the 1970's.

### (d) *The Doctrine of Breach of Fiduciary Relationship*

Plaintiffs' next theory is that a "fiduciary relationship" existed between Bessie Smith on one hand, and Frank Walker and John Hammond, on the other.[18] Plaintiffs allege that each served simultaneously as her business manager and as an executive of Columbia Records. They are alleged to have "breached" the "fiduciary relationship" of being her business manager by signing her to contracts in the best interest of Columbia, in that those contracts contained low payment fees and no royalty provisions. According to plaintiffs,

It is a well established principle of federal law that where the fraudulent conduct of a defendant prevents a plaintiff from becoming aware of the existence of a cause of action, the bar of the statute of limitations does not begin to run until the fraud is discovered. . . . Moreover, if there exists a fiduciary or confidential relationship between the plaintiff and the person alleged to conceal the cause of action, the plaintiff need show no evidence of the fraudulent concealment other than that implied from the transaction itself.

---

17. Plaintiffs have also alleged in ¶ 29 that the "fraudulent concealment" could only have been revealed by Chris Albertson's research. This, of course, is not an allegation of the affirmative efforts of Columbia Records to "divert, mislead, or prevent discovery." Rather, it is simply an allegation that would bear on the "reasonableness" of non-detection of the fraudulent concealment *if* it were otherwise alleged that Columbia had actively engaged in fraudulent concealment. Without such an allegation con-

cerning Columbia's activities, the allegation about Albertson's research methods is without legal force. We therefore grant it no effect here.

18. Hammond, described by Albertson as a wealthy young jazz enthusiast, met Smith in 1933 at which time he decided to record her. He became a producer. There are several joint Hammond-Columbia collaborations on the posthumous reissues of Smith's records.

Plaintiffs' Memorandum in Opposition to CBS's motion to dismiss at 5–6 (citations omitted).

In other words, according to plaintiffs, by merely alleging that a "fiduciary or confidential" relationship exists between two people who entered into a contract (as has been done in this case), and by simply alleging that any given contract was one-sided, one can succeed in tolling the statute of limitations, apparently indefinitely. Moreover, in plaintiffs' submission one can infer "fraudulent concealment" merely from the allegation that the transaction was unfair. If this were an accurate depiction of the law, it would be startling indeed. Any contract made hundreds of years ago could become the subject of a present day lawsuit. One would simply have to allege that: (a) the two people who contracted, presumably at arms length, were really in a "fiduciary relationship" which involved a "conflict of interests" for one of the parties; and (b) that the terms of the presumably arms length contract were in reality unconscionable. From such allegations, one could infer "fraudulent concealment," and with a magic legal wand stop the march of time for all the intervening years.

The correct doctrine of "breach of fiduciary duty" as it relates to tolling the statute of limitations is a much more modest and limited one. The best explication thereof we have found is in *Developments in the Law—Statutes of Limitations*, 63 Harvard L.Rev. 1177, 1214–16 (1950). While only the author's reference to "principal-agent" relationship is directly relevant to this lawsuit (since the relationship of Bessie Smith and her business manager is one of principal and agent), we find it helpful to review the scope of the whole doctrine as background:

(b) *Breach of Fiduciary Duty.*—To establish a cause of action for fraud or mistake the plaintiff must have been unaware of the wrong at the time it was done; such proof is of course not necessary to an action for a breach of fiduciary duty. Nevertheless, the two types of actions have been accorded similar special treatment under statutes of limitation, which is justified because here too the plaintiff will not ordinarily learn of the wrong for some time after the defendant's defalcation. This consideration is especially appropriate to the express formal trust, a relationship used frequently for the preservation and management of property for the young, infirm, or inexperienced, who are unlikely to have sufficient business acumen to determine when a breach has occurred. Indeed, the beneficiary of a trust is generally forbidden to interfere in the management of the res. Thus, the statute does not begin to run during the existence of the relationship unless the beneficiary knows, or reasonably should know, of the facts constituting the breach of duty. But when the trust terminates, and the property is delivered to the new trustee or to the beneficiary with a final accounting, the probability that the wrong will be disclosed is sufficient to warrant commencement of the statutory period. In view of these considerations, the rule of postponement is applied to defalcations of executors, administrators, and guardians, as well as trustees, but not to wrongs upon which a constructive trust is imposed by operation of law as a remedial device for the specific restitution of property, in the absence of a particular type of fiduciary relationship.

A similar probability of ignorance characterizes a breach of the fiduciary duty of a corporate officer or director, for the shareholder would ordinarily have no opportunity to learn of the wrong. But when the guilty officers do not dominate the corporation's affairs, it may be appropriate to charge the corporation with notice of the wrong, imposing on the other officers some duty of vigilance. Indeed, in the case of a close corporation, such vigilance might be demanded of the shareholders. In any event the business background of the corporate entity, as distinguished from the purposes of the express trust, might warrant the general imposition of a greater duty of diligence. Although some courts have treated the corporate director as a trustee, generally

the statute runs from the date of the wrong.

*Where an agent violates a duty owing to his principal, as by misappropriating his principal's property, limitations treatment will vary depending not only upon the nature of the wrong, but also upon the nature of the particular agency relationship involved.* Thus, where the type of activity being carried on, the duration of the agreement, and the relationship of the parties all tend to create the probability that the breach of duty will be unknown to the principal for some time, as in the case of a general agent managing his principal's business, the courts are likely to commence the statute only when the plaintiff discovers the wrong or when an account is rendered, as in the case of a trustee. *But where the circumstances indicate that the principal would ordinarily supervise his agent's activities fairly closely, as in the case of a collecting agent who makes frequent accountings, the statute begins to run when the agent commits the breach of duty. Since no general rule can be formulated in agency terms, in view of the wide variety of agency relationship, it would be desirable to deal with each case on its facts, delaying the running of statute only where the tendency of the wrong to remain unknown for a considerable time approaches a certainty.* (citations omitted) (emphasis added).

It is clear, then, that the phrase "breach of fiduciary duty" is not talismanic, in the presence of which the statute of limitations withers away. Quite the contrary, the contours of each particular *kind* of "fiduciary" relationship must be examined with care, to determine when the person wronged might reasonably, given the nature of the particular relationship, have been expected to learn of the breach.

■ We have examined the Pennsylvania case law, and have found it in accord with the general statement of the law expressed in the above passage. Indeed, a Pennsylvania Supreme Court case, *In re Huffman's Estate*, 349 Pa. 59, 36 A.2d 640

(1944) was the authority chosen in the Harvard article to illustrate the principle that "where the circumstances indicate that the principal would ordinarily supervise his agent's activities closely  .  .  .  the statute begins to run when the agent commits the breach of duty."  *Huffman's Estate* makes explicit that in Pennsylvania, an objective standard of "reasonable diligence" governs *all* "fiduciary" relationships, and especially that of principal and agent, by adopting the following language of an earlier decision:

*Clients and principals, who employ attorneys, whether at law or in fact, like all other men, are bound to exercise reasonable diligence about their own affairs.* The creditor, who allows his simple contract debts to run on, overdue, for more than six years, must charge their loss to his own negligence;  .  .  .  *so with the constituent who neglects to call his agent or attorney to account.* Statutes of Limitation are intended to promote promptness and punctuality in business; the settlement of claims while parties are alive; before papers are lost and witnesses die; and he who will not take the hint, must take the consequences.

349 Pa. at 63, 36 A.2d at 643 (emphasis added). We turn then to an examination of the complaint in light of the doctrine of breach of fiduciary duty.

Frank Walker is alleged to have been Bessie Smith's "manager" during the 1920's and early '30's (¶ 18). He is alleged to have been a "Columbia Record executive" at the same time he was her manager (¶ 18). John Hammond is alleged to have been her "agent" during 1933 (¶ 22). He is alleged to have acted as her agent in 1933 "while an official of Columbia" (¶ 22). Both men, then, alleged to have been Bessie Smith's agents, are of course chargeable with whatever fiduciary duty inheres in the principal-agent relationship. Nowhere in the complaint is there delineation of the duty of these agents supposedly had, or of the "breach" for which they are supposedly liable. We therefore construe the complaint to allege the following breaches: first, act-

ing simultaneously as agent for a principal and as official of the recording company with whom that principal enters into contractual relationship is an inherent breach; and second, actively negotiating a contract as agent with the record company for whom one works as employee, at terms less than the fair market value of the principal's services, is a breach of fiduciary duty. *See* ¶ 18, quoted in full *supra.* Reasoning backwards, if these are the breaches involved, then plaintiffs must be alleging that Walker (and Hammond) had the *duty* (1) not to act in conflicting roles, and (2) not to negotiate contracts on Bessie Smith's behalf at less than her artistic services were worth at fair market value.

■ With some effort, then, we have been able to extract from this opaque complaint an allegation of agency, allegations of the particular kind of agent-principal duty involved, and allegations of breaches of this duty. However, this is not the end of the line. We must apply to those allegations the legal standard of *In re Huffman's Estate* that principals are bound to exercise "reasonable diligence about their own affairs." Taking as true the allegations of agency, of duty and of breach as delineated above, are they sufficient as a matter of law to permit the inference that the breaches alleged would have remained *concealed* from a "reasonably diligent" principal (and his or her successors in interest) for over forty years? For it is of course only if there has been *concealment* of the principal-agency breach that the statute is tolled for the time of that concealment.

At the threshold, we must separate the discussion of Frank Walker and John Hammond. We first focus on the latter. The only allegations implicating Hammond are found in ¶ 22 described above. These allegations are contained in an unverified complaint. Plaintiffs have submitted no evidence by way of affidavits, depositions, or the like, tending to establish that Hammond was either an employee of Columbia Records or Bessie Smith's agent. (This contrasts with the allegations concerning Frank Walker, where plaintiffs have sub-

mitted from contracts signed "Frank Walker for Bessie Smith," which certainly raises an issue of some kind of agency relationship, albeit of unspecified dimensions).

■ From John Hammond's deposition in this case, filed of record, it clearly appears that Hammond was *not* an employee of Columbia, at least at the time in question. It further clearly appears that he did not act in the capacity as Bessie Smith's agent. Quite the contrary, according to his deposition, he persuaded Columbia—which after recording Bessie Smith as an exclusive artist during the years 1923 to 1931, had no further resources to pay to record her in 1933—to make and issue the records in 1933 provided that *he*, John Hammond, paid Smith. If anything, the deposition shows the reverse of the roles alleged—that John Hammond was the principal in the relationship, and Bessie Smith the agent. *See* Hammond's deposition at 98–99. Therefore, there can not have been either a breach of any principal-agent relationship with Smith as principal, or a breach involving a conflict of interest. We must thus grant summary judgment in favor of defendants on the issue whether the allegations of ¶ 22 of the complaint state a legally sufficient ground to toll the statute of limitations.

■ That leaves the allegations concerning Frank Walker, contained in ¶¶ 17, 18, 19, and 20. Plaintiffs allege that Walker, as agent, owed Bessie Smith, his principal, the duty to inform her of the "two hats" he wore, and the duty to negotiate recording contracts for her at fair market value. Plaintiffs further allege that Walker breached both of these duties. Assuming the correctness of plaintiffs' view of Walker's duties to Smith and his breaches thereof, the issue we must decide for statute of limitations purposes relates to the discovery or discoverability of those breaches. Although plaintiffs claim that Smith was unaware of Walker's "conflicting" roles, and that she was also ignorant of the value of her services, we think the record belies this view. What is more important though, is that these claims relate to Smith's *subjec-*

tive knowledge, while *Huffman's Estate* clearly instructs that the applicable legal standard is a reasonable person or *objective* test. Applying the appropriate standard, the question is not whether Smith actually discovered Walker's alleged breaches of duty, but whether she should have discovered those breaches had she acted as a reasonably diligent principal. The answer to that question is an unequivocal yes. The fact of Walker's employment with Columbia was widely known, and Bessie Smith, so intimately involved with Columbia as a recording star, is certainly chargeable with this general knowledge. Smith also must be charged as a reasonably diligent principal with the obligation to ascertain what her artistic services were worth in the record market.

Other allegations in the complaint support our conclusion that an inference of immediate discoverability is the only reasonable one. Paragraph 23 alleges that eight recordings contracts were executed between Bessie Smith and Columbia between 1923 and 1931. Columbia has stated that there was immediate payment to Smith with each contract, and neither by allegation nor record evidence have plaintiffs disputed this. It is clear then, that the Smith-Walker agency relationship that plaintiffs describe is very similar to that of *In re Huffman's Estate, supra, i. e.,* one where there reasonably should have been constant supervision of the agent's activities. ". . . Where the circumstances indicate that the principal would ordinarily supervise his agent's activities fairly closely, as in the case of a collecting agent who makes frequent accountings, the statute begins to run when the agent commits the breach of duty." *Developments in the Law, supra* at 1216.

The only reasonable inferences permissible under the allegations of the complaint are that the principal (Bessie Smith) would constantly have been in a position to know what she was receiving as payment, that she would have been in a position to know what her artistic services were worth at fair market value, and that she would have been in a position to discover that her "agent" was an official of the very recording company for which she was an exclusive artist for ten years. If there are reasons why she, or her successors in interest, could not learn of the alleged breaches, they have been nowhere alleged nor otherwise raised by the record in this case.

■ It is apparent to us that plaintiffs are actually attempting to allege a theory that the breaches were concealed from Bessie Smith and her heirs because of their ignorance, lack of business sophistication, and general societal conditions. *See* ¶¶ 11, 12 and 29. "The amended complaint in this action alleges, *inter alia*, that defendant and its agent took undue advantage of the confidential relationship that existed between them and Bessie Smith and that both Bessie Smith and Jack Gee, Sr. were uneducated and illiterate and unable to discover the existence of the pending cause of action." Plaintiffs' Memorandum at 5. In terms of the Harvard *Developments* article, plaintiffs seem to be seeking to avail themselves of the theory that there was an "express formal trust," rather than the kind of agency relationship described in *Huffman's Estate*. " 'The express formal trust' is used frequently for the preservation and management of property for the young, infirm, or inexperienced, who are unlikely to have sufficient business acumen to determine when a breach has occurred. Indeed, the beneficiary of a trust is generally forbidden to interfere in the management of the res." Harvard *Developments, supra* at 1215. Under this theory, of course, "the statute does not begin to run during the existence of the relationship unless the beneficiary knows, or reasonably should know, of the facts constituting the breach of duty." *Id.* at 1215.

■ Even if we construe the allegations to assert the existence of an "express formal trust," this theory is dispelled by the record. The only evidence of any agency relationship between Bessie Smith and Frank Walker are the recording contracts he signed on her behalf. They could not be further from express trust instruments.

Without a showing of an express formal trust, an allegation of mere ignorance or lack of business sophistication is clearly insufficient as a matter of law to toll the statute. *See Walters v. Ditzler*, 424 Pa. 445, 227 A.2d 833 (1967) ("mere mistake, misunderstanding or lack of knowledge do not toll the running of the statute of limitations . . . the statute of limitations will run against persons under a disability, including minors and incompetents." *Id.* at 449–50, 227 A.2d at 835.) [19]

To summarize, then, on the question of the Smith-Walker relationship, we have found the allegations of the existence of an agency relationship, of the type of duty inhering in that relationship, of the breach of that duty and of the *concealment* of that breach insufficient under the applicable law to permit the statute of limitations to be tolled for over forty years.

(e) *The Doctrine of Revival of a Promise to Pay*

■ Plaintiffs' final theory for tolling is contained in ¶ 30 quoted in full *supra.* Here plaintiffs are advancing the "acknowledgment" doctrine as applied to the statute of limitations: a debt which is time-barred may be "revived" by an acknowledgment by the debtor. "It has long been recognized that the expiration of the statutory period does not bar the claim if the plaintiff can prove an acknowledgment, a new promise, or part payment made by the defendant either before or after the statute has run. . . . Such conduct 'revives' the cause of action so that the statute starts to run again for the full statutory period." *Developments in the Law—Statutes of Limitations,* 63 Harvard L.Rev. 1177, 1254 (1950).

The statement on which the "acknowledgment" or "revival" theory is based in our case has been made part of the record of this case, and is reproduced below in full. The statement was originally made on WNET–TV:

With me in the studio this evening is an executive of one of the country's largest recording companies, he is Bruce Lundwall, Vice President in charge of marketing for Columbia Records. Ray McArthur, the producer of tonight's feature report is also with us. Mr. Lundwall, you're with Columbia Records, this company has produced a lot, a sizeable number of jazz recordings and among them some very good reissues. Is there an attempt to compensate the artists economically, beyond the restrictions of the contractual stipulations?

L. I think so, I think at Columbia and it's really true of other recording companies as well, today, that the kind of compensation that I'm thinking about here is the type of thing where the company will support the artist while on tour, will support an engagement with an advertising campaign surrounding that engagement so that we are also promoting his appearance, trying to get people into the nightclub or into the concert hall to see the artist as well as to sell his album product. I think that in fact the contractual arrangements with all artists today, jazz artists as well as rock artists, gives the artist far more than he would have gotten in a contractual situation 10 years ago or 20 years ago. And furthermore, I rather disagree with much of what I saw in this film although it's certainly to a degree accurate. I think that the outlook for jazz today is indeed very healthy.

Q. The economic outlook or the reception by the audience?

L. Well

Q. Both?

L. Both certainly go hand in hand

Q. Bessie Smith is once again very much in vogue, I learned that from the film, the book is out by Chris Albertson and her records are again making

19. While not a basis for our judgment, the Albertson book (put into the record by the plaintiffs) strongly inveighs against the express formal trust theory (*see* comments at note 8, *supra* ).

money. Now in the film we were told that there was no compensation being paid to her estate or so, but what happens in situations like these? Does the money just go back into the company, to be reinvested in company stock or is some support of the art thought about?

L. No, absolutely, the latter is the case. There was royalty paid, a payment made to the Bessie Smith Foundation, number one, and secondly John Hammond and Clive Davis, the President of Columbia Records, are attempting to form a scholarship fund in Bessie Smith's name to support needy black students with royalties from the sale of these albums. And indeed they have sold well.

Q. In other words, Bruce are you saying then that you are paying royalties on the reissues constantly or did you just make one block?

L. We made one payment initially, but the royalties have accumulated in an account and will be used for a fund for needy black students in the future and this is being arranged for by the president of the company and John Hammond who was largely involved with Chris Albertson in putting the repackaging together.

■ Pennsylvania has taken a strict view of the "acknowledgment" doctrine, requiring "a clear, distinct or unequivocal acknowledgment of the debt":

A clear, distinct, or unequivocal acknowledgment of the debt is sufficient to take the case out of the operation of the statute. It must be an admission consistent with a promise to pay. If so, the law will imply the promise, without its having been actually or expressly made. *There must not be uncertainty as to the particular debt to which the admission applies.*

*In re Nicolazzo's Estate,* 414 Pa. 186, 190, 199 A.2d 455, 458 (1964), *quoting Palmer v. Gillespie,* 95 Pa. 340 (1880). The above quote reflects the fact that in Pennsylvania use of the doctrine is confined almost exclusively to suits upon a promissory note.

■ The last sentence notwithstanding, we assume arguendo that the Pennsylvania rule of acknowledgment is applicable to the various "contract" actions in the § 1981 count. Doing so, we are unable to find in Lundvall's statement an acknowledgment of any debt that is clear, distinct or unequivocal. Mr. Lundvall states that the Columbia Records corporation desired to "support the art" (presumably of jazz and/or blues, judging by the context of the remarks), and in doing so contributed money to various foundations or funds. Several vague references to "royalties" by Mr. Lundvall are insufficient to dispel any "uncertainty as to the particular debt to which the admission applies," as required in Pennsylvania.

We, therefore, will grant defendant summary judgment on the issue whether the statement by Bruce Lundvall is sufficient "acknowledgment" of any of the § 1981 claims to "revive" them.

### 4. Consistency of the Tolling Principles with § 1981

■ Our final step in this extended inquiry is to ask whether any of the Pennsylvania tolling principles we have located as applicable to this action are "inconsistent" with § 1981, as that phrase is explained in *Robertson v. Wegmann, supra.* We find no such inconsistency. The Pennsylvania tolling provisions are not unique or unduly restrictive when compared with the general law of tolling summarized in the *Developments in the Law* article *supra.* A comparable consonance was a factor in leading the Supreme Court in *Robertson* to declare the Louisiana survival statute not inconsistent. *See* 436 U.S. at 592 n.3, 98 S.Ct. 1991. And simply because application of the Pennsylvania tolling doctrine may time-bar some or all of plaintiffs' claims in this suit, we are not necessarily lead to a conclusion of "inconsistency," for as stated in *Robertson*:

A state statute cannot be considered "inconsistent" with federal law merely because the statute causes the plaintiff to lose the litigation. If success of the . . .

action were the only benchmark, there would be no reason at all to look to state law, for the appropriate rule would then always be one favoring the plaintiff, and its source would be essentially irrelevant. But § 1988 quite clearly instructs us to refer to state statutes; it does not say that state law is to be accepted or rejected based solely on which side is advantaged thereby.

436 U.S. at 593, 98 S.Ct. at 1997. We conclude that the tolling provisions we have identified and used in this suit are not inconsistent with § 1981.

### 5. *Summary*

In the foregoing discussion, we have limited ourselves to those claims based on 42 U.S.C. § 1981, which accrued to Bessie Smith herself before her death in 1937, and specifically to transactions between her and Columbia from 1923 to 1933.

■■■ We first found that the claims do not satisfy Fed.R.Civ.P. 17(a), the real party in interest rule. Although under other circumstances we might grant plaintiffs leave to amend to correct the deficiency at this time, this is a case in which plaintiffs have already amended twice, and as in baseball, one doesn't get a fourth strike. There is, however, a second ground on which we dispose of plaintiffs' § 1981 claims: the statute of limitations. Despite plaintiffs' assertion that summary disposition, via either Rule 12 or Rule 56, is improper to resolve issues of tolling the statute of limitations, we find the weight of authority to be otherwise. Our Circuit has held that a Rule 12 motion may be utilized to raise a statute of limitations issue. *Hanna v. United States Veterans' Administration Hospital,* 514 F.2d 1092, 1094 (3d Cir. 1975). Such a motion is the proper vehicle for disposing of a claim on statute of limitations grounds if "the time alleged in the statement of a claim shows that the cause of action has not been brought within the statute of limitations." *Hanna, supra,* at 1094.

In this derivative § 1981 claim there is clearly such a showing. We are considering only claims Bessie Smith might have had. As pleaded, these claims all arose before 1933, in a situation where a six year statute of limitations is operative.

■■■ The issue then becomes whether plaintiffs have made sufficient allegations to state a legally sufficient reason for tolling the statute of limitations for forty years. Where plaintiffs' pleadings clearly show that the statute of limitations would otherwise be a bar, it must, by logic, be part of plaintiffs' further pleading burden to allege facts, which are taken as true for purposes of the motion, to justify tolling the statute of limitations. We find this wholly logical extension supported in case law. *See e. g. Hellebrand v. Hoctor,* 331 F.2d 453 (8th Cir. 1964) ("Where, as here, the complaint on its face is barred by the Statute of Limitations, the plaintiff by appropriate allegation must bring himself within one of the exceptions contained in the above disability statute." *Id.* at 455.) As we see it, the inclusion of factual considerations into the equation transforms the motion to dismiss into one for summary judgment under Rule 56, and there is no question that the statute of limitations bar may be effectuated on a Rule 56 motion.

In our situation, unlike *Hellebrand,* we are not concerned with a legislatively-enacted statute of disabilities. Instead, we are concerned with common law tolling doctrine as enunciated by the Pennsylvania state courts.[20] This places an additional burden on plaintiffs in our case: since two of the four possibly-applicable tolling doctrines (inherent fraud and fraudulent concealment) involve fraud, those additional pleadings demanded of plaintiffs must meet the specificity requirements of Fed.R.Civ.P. 9(b). That requirement means that facts showing the existence of at least five of the

**20.** The "disability statute" at issue in *Hellebrand* tolled the statute for minors, the insane and those imprisoned, as well as for concealment by one's adversary. 331 F.2d 453, 455. The lack of a comparable Pennsylvania statute,

and therefore the exclusive applicability of a judge-made, equitable tolling doctrine in Pennsylvania, is noted by the Pennsylvania Supreme Court in *Walters v. Ditzler,* 424 Pa. 445, 450 n.3, 227 A.2d 833, 835 n.3.

six elements enunciated in *Southern Development Co. v. Silva, supra, (i.e.* all those except the "intent that the misrepresentation be acted on," eliminated by *Nesbitt, supra* ) must be pleaded. 2A *Moore's Federal Practice* ¶ 9.03 at 1924 (2d ed. 1978). (This additional 9(b) burden is, of course, not imposed on the pleading requirements under the other two applicable tolling doctrines raised by the complaint, breach of fiduciary duty and acknowledgment of debt). Under the above standards, all of Count I must be dismissed either under Rule 12 or Rule 56. More specifically we hold as follows.

We will grant defendants summary judgment on the allegations contained in ¶ 22 concerning John Hammond. There is no genuine dispute of a material fact concerning his role in the 1933 recordings, and as a matter of law those facts cannot serve to toll the statute of limitations from 1933 to 1974. The allegations of ¶ 22 may not be considered further as to any count of this complaint. We also grant defendants summary judgment on the allegations of ¶ 30, involving Bruce Lundvall's supposed acknowledgment of a debt. There is no dispute as to the facts of that "acknowledgment," and we find as a matter of law that there was insufficient acknowledgment of a specific debt owed to Bessie Smith to revive any contractual debts from the 1920's and 1930's. The allegations of ¶ 30 may not be considered further as to any count of this complaint.

Under the *Holmberg-Nesbitt* theory of inherent fraud, only ¶¶ 20 and 25 can remotely be construed as alleging inherent fraud. We dismiss the "inherent fraud" claim of ¶ 20 and ¶ 25 because, after three opportunities, plaintiffs have still failed to allege with sufficient particularity or specificity the fraudulent scheme involved in the copyright/licensing transactions of those two paragraphs. *See generally* 2A *Moore's Federal Practice* ¶ 9.03 at 1923–37 (2d ed. 1978), especially at n.15 and accompanying text, showing examples of sufficient pleadings under Rule 9(b). Instant plaintiffs have not set forth, as to the scheme involved in ¶¶ 20 and 25, factors which would permit a reasonable inference that the scheme was self-concealing, without the reasonable possibility of detection, until at least 1969 (six years before this lawsuit was filed). We have previously discussed the general principles which govern the grant of leave to successively amend, and see no need to rescribe them here. We do add that this is not a case where plaintiffs have been deprived of opportunity to develop facts which would give rise to adequate pleadings, or if requisite specificity might equally be appropriate in their answering papers (to defendants' motion), to set them forth then.

Plaintiffs have propounded two sets of interrogatories during the three years since commencement of this suit, and both sets have been answered. By plaintiffs' own admission in the allegations, Chris Albertson finally revealed the fraud in 1972 by publishing his biography of Bessie Smith. Chris Albertson has been deposed by plaintiffs in this lawsuit. In short, under plaintiffs' own theory, the fraudulent scheme engaged in by defendant has been fully exposed for several years, and plaintiffs have had every opportunity in this lawsuit to learn the particulars of that scheme and to set it forth in their second amended complaint or their answering papers (to defendants' motion). Their failure to do so can only be deemed as a concession that they cannot do so. Accordingly the doctrine of inherent fraud used as a tolling device cannot prevent the dismissal (via Rule 12 or Rule 56) of Count I of plaintiffs' complaint.

Turning to the doctrine of "fraudulent concealment" as a tolling principle, in ¶ 29 plaintiffs fail to meet the requirements of *Overfield* and *Knuth.* Plaintiffs have not alleged facts which permit the reasonable inference that defendant took affirmative efforts to mislead, divert or prevent discovery of the facts alleged in ¶¶ 14, 17, 18, 19, 20, 21, 22, 23, 24, 25, or 26, and that such efforts succeeded, without the reasonable possibility of detection, on a continuous basis until at least 1969. Rule 9(b) and the failure to be more specific by this time are

fatal. It is insufficient for plaintiffs to allege that the "various means and methods" of concealment are known only to defendant. It is *plaintiffs'* pleading burden to satisfy Rule 9(b).

Finally, turning to the doctrine of "breach of fiduciary relationship," all paragraphs of the complaint implicating this doctrine except ¶¶ 17 and 18 are irrelevant. As to ¶¶ 17 and 18, plaintiffs claim fails because they have not alleged, despite years of opportunity to explore the matter and to do so either in their second amended complaint or their answering papers, facts which can support the reasonable inference that *concealment* of the breach of the principal-agency relationship alleged between Bessie Smith and Frank Walker would not have been possible to detect by a reasonably diligent principal until at least 1969. In accordance with our discussion, we deny leave to amend a third time. Thus neither the fraudulent concealment nor breach of fiduciary relationship doctrines used for tolling purposes can prevent the dismissal (via Rule 12 or 56) of Count I. For the foregoing reasons, we dismiss all of Count I as predicated on a representative, derivative theory of liability.

### C. *Suit in a Non-Representative Non-Derivative Capacity*

Plaintiffs have, as an alternative § 1981 theory, sought what we can only characterize as an ingenious way around the foregoing hurdles of the survival statute and the statute of limitations: they are not suing under § 1981 for wrongs done to Bessie Smith in the past; rather, they are suing for wrongs being done to *themselves* in the *present.* Therefore, any questions of proper "survival" of an action, and any possibility of a time bar, disappear in one fell swoop. They explain the theory in the following manner:

> Plaintiffs here are heirs of Bessie Smith and in their own right now possess the property rights of Bessie Smith. In the instant complaint, plaintiffs are seeking redress under federal and state statutory and common law to protect plaintiffs' own property rights which are clouded by racially discriminatory contract arrangements allegedly made between Bessie and defendant. Plaintiffs allege that the mechanical license and artist contract arrangements to which defendant claims they are bound as successors in interest to Bessie Smith, were racially discriminatory when originally signed and continue to be racially discriminatory as long as they are in force, or otherwise affect current rights of plaintiffs. Since plaintiffs are directly affected and allegedly bound by these purported contracts which defendant claims impose restrictions and obligations on them, presently and into the future, and on which defendant relies to support its nonliability to plaintiffs' claims, plaintiffs themselves are harmed by the racially discriminatory character of these contracts. See *Baker v. F & F Investment,* 420 F.2d 1191, 1196 (7th Cir. 1970).

\* \* \* \* \* \*

> Here we have individuals [instant plaintiffs] who themselves are subject and directly wronged by defendant's discriminatory actions. Plaintiffs, as heirs of Bessie Smith, (as composer) have independent property rights to the copyrights and copyright renewals for those musical compositions written and composed by Bessie. . . . In addition, plaintiffs have inherited property rights in the artistic renditions, name, likeness, and reputation of Bessie Smith as performing artist. . . . Since defendants' discriminatory conduct affects the plaintiffs' rights and continued interest in this property, the discriminatory character of the contracts inflicts upon plaintiffs a wrong equally as great as that inflicted upon Bessie Smith.

> *Contract Buyers League v. F & F Investment,* 300 F.Supp. 210, 221 (N.D.Ill. 1969), aff'd sub nom. *Baker v. F & F Investment,* 420 F.2d 1191 (7th Cir. 1970), *cert. den.* 400 U.S. 821, 91 S.Ct. 42, 27 L.Ed.2d 49 (1970).

We start with the authority on which plaintiffs place primary reliance, *Contract*

*Buyers League.* In that case, plaintiffs were a group of black homeowners in the Chicago area who charged defendants with violating their § 1982 rights to "purchase, lease, sell, hold, and convey real and personal property" on terms equal to that of white citizens by the following scheme: first, defendants would "blockbust" a "white" neighborhood, obtaining depressed prices from panicked white homeowners; second, defendants would take advantage of the shortage of homes available for blacks in Chicago by selling them these same homes at rates greatly in excess of the fair market value. These exorbitant purchase prices led to contracts with defendants for exorbitantly high mortgage payments. Plaintiffs charged there was a continuing series of § 1982 violations being inflicted on them: the harm did not occur simply in the original *execution* of the purchase contracts, rather it recurred until the *termination* of the contracts, because of the high installments exacted and because plaintiffs were frequently evicted from their homes for non-compliance with the contracts. The district court and the Seventh Circuit agreed with plaintiffs that, under these factual allegations, the *termination date* rather than *execution date* governed for purpose of determining the running of the statute of limitations.

■ To say that plaintiffs' reliance on *Contract Buyers League* is "misplaced" is a considerable understatement. *Contract Buyers League* stands for the wholly reasonable proposition that in an action alleging continually recurring harms under a racially discriminatory contract, the statute of limitations runs not from the contract's execution date, but rather from the date of the last harm inflicted, up to the contract's termination date. Plaintiffs here attempt to work an alchemy on that holding by asserting that Bessie Smith's failure to execute favorable contracts in the first place, caused by what plaintiffs contend was racial discrimination, constitutes a continuing harm against those claiming to be Smith's heirs, analogous to the *Contract Buyers League* harm, because they are foreclosed from re-entering or renewing what should have been more lucrative contractual provisions.

The analogy clearly fails. In the first place, the nature of the "continuing" harm is entirely different in the two cases. While the *Contract Buyers League* "continuing harm" theory is predicated on precise, delineated contractual obligations between plaintiffs and defendants, instant plaintiffs' "continuing harm" theory is predicated on lost or missed contract opportunities. In *Contract Buyers League* plaintiffs were obligated to pay regular, allegedly exorbitant and discriminatory, installment payments. The harm "continued" for the duration of the contracts, which we assume to be between twenty and thirty years (the normal range for mortgages), and was re-inflicted at each installment interval. In contrast, the theory of harm in this case is based on contract rights Bessie Smith might have had but did not execute, allegedly because of discrimination; royalty provisions she might have benefited from but never entered into, lucrative flat recording fees she might have had, fees she might have demanded for Columbia's use of her name and likeness, royalties for the songs she composed and could have copyrighted but did not, and so forth. Plaintiffs' theory is that the harm from missing these might-have-been-but-for-racial-discrimination contract opportunities "continues" and is re-inflicted anew every time Columbia Records and its corporate successors make a profit from a Bessie Smith song or recording, or from use of her name or likeness. The harm "continues" unabated to her purported heirs, who of course "might have inherited" the rights to renew the lucrative contracts if she had ever entered into them in the first place. The argument falls of its own weight.

While the *Contract Buyers League* "continuing harm" theory has a definite time limit—the duration of the contractual obligation—plaintiffs' theory in our case, by its internal logic, has no time limit whatever. Bessie Smith's failure to enter into beneficial contracts means her heirs cannot renew these beneficial contracts. Presumably *their* heirs cannot renew the contracts, and

*their* heirs are similarly foreclosed, and so on through the ages. Each generation of heirs would have to merely assert that "but for" the original discrimination against Bessie Smith, they would have inherited more from her estate, and by such an allegation the hypothesized harm against Bessie Smith is metamorphosed into a harm against plaintiffs, no matter how many generations removed. Concomitantly, the failure of any previous generation to sue on its cause of action would be irrelevant to the next generation's ability to maintain a new cause of action, since the harm has "continued" with undiminished force until someone asserts rights he or she "might have had" but for the original act of contractual discrimination against Bessie Smith. In sum, plaintiffs argue that so long as the corporate defendant continues to profit by virtue of the contractual arrangements it had with Bessie Smith (e. g., so long as it gains by selling her records and not having to pay her heirs royalties), each generation has a new § 1981 cause of action. By the logic of plaintiffs' theory this could go on in perpetuity.

It becomes clear that while *Contract Buyers League* addressed the limited question whether the execution date or termination date of a contract should govern for purposes of determining the running of the statute of limitations, the plaintiffs' novel theory of § 1981 liability dispenses with the statute of limitations entirely. Since each new generation "inherits" a new cause of action and since there is a new harm inflicted each time defendant profits, there is never any question of an action being time-barred so long as it is filed within six years of the last instance of corporate profit.[21]

We see then that plaintiffs' theory is simply an ingenious attempt to play legal hopscotch over the various lines delimiting the proper scope of a § 1981 cause of action. Plaintiffs have attempted to avoid the requirement that a federal civil rights action can continue from the original person wronged to another *only* by virtue of the applicable survival statute, *see Spence v. Staras,* 507 F.2d 554, 557 (7th Cir. 1974), by asserting that each generation automatically "inherits" the lost contractual opportunities of the previous generation. They have similarly attempted to avoid the requirement that they prove they are in fact Bessie Smith's heirs through the normal intestacy or probate process, which would entail suit by Bessie Smith's personal representative, by simply assuming they are her heirs (see plaintiffs' first sentence quoted *supra* at 637). They have attempted to avoid the requirement that the statute of limitations governs a § 1981 action by proposing a theory of "continuing harm" which "continues" in perpetuity, and on which the statute of limitations can never run. And finally they have ignored the fact that the gravamen of their § 1981 action is the *lack* of contractual rights Bessie Smith enjoyed during her lifetime and therefore at the time of her death.

This is not, as plaintiffs style it (see language quoted *supra* at p. 637), "clouded property rights" they have "inherited" or to which they are "bound" as "successors in interest". Rather, it is an alleged deprivation of Bessie Smith's right to contract, or otherwise put, the § 1981 cause of action Bessie Smith might have had. Like any cause of action, it is only capable of surviv-

---

**21.** In a supplemental memorandum, plaintiffs have added the following authorities for their "continuing harm" theory: *International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977), *Franks v. Bowman Transportation Co.,* 424 U.S. 747, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976), and *Barrows v. Jackson,* 346 U.S. 249, 73 S.Ct. 1031, 97 L.Ed. 1586 (1953). In none of these cases can we find a shred of support for plaintiffs' theory. *IBT* and *Franks* addressed the validity of seniority systems under Title VII and the appropriateness of retroactive seniority placement as Title VII remedies. *Barrows* addressed the question whether using a state court for a damage remedy based on violation of a racially restrictive covenant constituted "state action" for purposes of the equal protection rights of a black person. In neither the facts nor the law of any of these cases was there reference to a cause of action based on discriminatory deprivation of contract rights which passed from generation to generation outside the survival statute by virtue of a "continuing harm" theory.

ing her death pursuant to an applicable survival statute. And like any cause of action, it is subject to the running of the statute of limitations. In short, there can be no § 1981 claim in this lawsuit other than the one we discussed in part II.B. *supra,* which we found to have failed because of the Pennsylvania statute, the real party in interest rule, and the statute of limitations.

█ Therefore, as to plaintiffs' claim founded on a § 1981 harm to themselves based on purportedly "inherited clouded property rights," we conclude plaintiffs have failed to state a claim upon which relief can be granted. Accordingly, we dismiss with prejudice all claims founded upon 42 U.S.C. § 1981 which are predicated on "non-derivative" liability, *i. e.,* all claims which are not based on causes of action which accrued to Bessie Smith herself, and which survived her death by virtue of the applicable survival statute. Thus we dismiss Count I in its entirety.

III. *Common Law Contract Remedies*

Count II, based on either diversity of citizenship or pendent jurisdiction, reads as follows:

### Count II
### INVALIDITY OF CONTRACTS BETWEEN BESSIE SMITH AND COLUMBIA

33. During her lifetime, Bessie Smith purportedly entered into certain agreements, contracts, and understandings with Columbia with respect to payment to her as a recording artist, and as a composer and author of songs for recording. By reason of defendants' actions, and those of its predecessors, agents and representatives as aforesaid, all of such contracts for payment for performer's recording rights, and for author's and composer's rights in recorded songs, are null and void on the following alternative grounds:

(a) With one exception involving a minor copyright contract for a single song, Bessie Smith never actually executed personally during her lifetime any contract for recording rights or copyrights with Columbia, and accordingly no contract exists which would limit or restrict the rights of the plaintiffs herein, except insofar as verbal agreements with Columbia were executed by Bessie Smith's performance during her lifetime. As a result, Columbia is obligated to the plaintiffs under an implied contract or under quantum meruit, in consideration of the services rendered by Bessie Smith to Columbia during her lifetime.

(b) In the alternative, if any contracts between Bessie Smith and Columbia were in writing, they were executed without her consent or authority by Bessie Smith's reported agent who was in fact a person or persons employed by Columbia, who did not protect her interests, all to the knowledge, approval and acquiescence of Columbia. All contracts signed or entered into between Bessie Smith and Columbia by Clarence Williams, Frank Walker or John Hammond are void and of no effect because they were entered into without the consent or authorization of Bessie Smith, to the knowledge of Columbia, at a time when those persons served in the conflicting roles as manager or agent of Bessie Smith, and also an officer of Columbia. In addition, any contracts entered into between Jack Kapp, or publishing companies which he owns or in which he has an interest, and Columbia are void and of no effect insofar as they relate to royalties payable on songs authored or composed by Bessie Smith and surreptitiously appropriated by Jack Kapp, at a time when he was an employee of Columbia.

(c) In the event the Court determines that recording and copyright contracts were executed by Bessie Smith or with her authorization, with Columbia, they should be invalidated because they were negotiated on her behalf and executed on the advice of

persons having a direct conflict of interest with her own interests, and who otherwise stood in a fiduciary duty in relation to her, which fiduciary duty was breached in connection with the execution of these contracts. Columbia had actual and constructive knowledge of this conflict of interest and the breach of fiduciary duties when it entered into these contracts.

(d) In the event the Court determines that these contracts were executed between Bessie Smith and Columbia, these contracts should be invalidated because their terms for payment to Bessie Smith for her performances and her copyright rights are unconscionable, and there has been a failure of consideration on the part of Columbia in return for those rights and services.

34. By means of such invalid contracts, and misrepresentations to the public that the contracts are valid and that all property rights in Bessie Smith's recordings and in the songs which she composed and authored belong to Columbia, Columbia has produced numerous recordings, master records, matrices, re-issues, and re-recordings of works composed and performed by Bessie Smith without valid authorization to do so, all to plaintiffs' great detriment and loss, and to the great profit and enrichment of defendants.

35. Defendants are continuing to produce re-recordings of Bessie Smith records under claim of valid contract rights which are in fact invalid, and unless enjoined, will continue to produce such re-recordings and make other uses of Bessie Smith's recordings for Columbia without payment to the plaintiffs, and foreclosing to plaintiffs the opportunity to sell such rights to these recordings to others for valuable consideration.

Plaintiffs are quite clearly asking us to invalidate all contracts between Bessie Smith and Columbia Records. The contracts must be those set forth in ¶ 23, quoted *supra*. Therefore they must be limited to events that occurred between 1923 and 1933. As in Count I, this poses an obvious statute of limitations question.

We are sitting with respect to this Count as a state court would, exercising either diversity or pendent jurisdiction. (Both appear to be present). Our mandate under *Klaxon v. Stentor Electric Manufacturing Co., Inc.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941) is to apply the choice of law principles of the forum state, here Pennsylvania. The threshold issue is which state's statute of limitations would be applied by a Pennsylvania state court sitting on the claim before us.

■ The traditional Pennsylvania choice of law rule on statutes of limitation is found in *Freeman v. Lawton*, 353 Pa. 613, 617, 46 A.2d 205, 206–207 (1946): "But whether the suit was in time is not to be determined by the law of Florida; the law of the remedy must be found in this Commonwealth." (The "rights/remedies" distinction is virtually identical to the more familiar "substance/procedure" distinction, whereby the forum court automatically applies forum law to all "procedural" questions). Judge Weber, in a thoughtful opinion, carefully considered whether this traditional rule had remained intact after *Griffith v. United Air Lines*, 416 Pa. 1, 203 A.2d 796 (1964). He concluded it had. *Schenk v. Piper Aircraft Corp.*, 377 F.Supp. 477 (W.D. Pa.1974), *aff'd mem.* 521 F.2d 1399 (3d Cir. 1975). *See also Bulkin v. Western Kraft East, Inc.*, 422 F.Supp. 437 (E.D.Pa.1976). We find no cases which reach a different result. *Cf. Melville v. American Home Assurance Co.*, 584 F.2d 1306, 1310 (3d Cir. 1978) (Pennsylvania would adhere to traditional substance/procedure distinction for things routinely labeled as procedural by the Pennsylvania courts.) In sum, all the authority points in the direction of applying the Pennsylvania statute of limitations, regardless of which state's substantive law is chosen to be applied to the contracts themselves. It follows inexorably that Pennsylvania would apply its own tolling provisions to the limitations period.

Having so decided, we find ourselves traversing the identical terrain we did in dis-

cussing Count I, although this time we do so by virtue of *Klaxon* rather than 42 U.S.C. § 1988. Fortunately, in the wake of that discussion, we can proceed more expeditiously.

■ Paragraph 33, in subsections (a), (b), (c), and (d), states four alternative theories for rescinding the Bessie Smith-Columbia Records contracts between 1923 and 1933. We do not reach the question of rescission as a doctrine of substantive contract law. We do not even reach the question of which state's law would govern the rescission question of Count II. We are reading Count II solely to ascertain what justification plaintiffs set forth for asking a court in 1979 to examine the validity of contracts allegedly made forty-five to fifty-five years ago.

We can locate only two such allegations. One is that the contracts were "negotiated on her behalf and executed on the advice of persons having a direct conflict of interest with her own interests, and who otherwise stood in a fiduciary duty in relation to her, which fiduciary duty was breached in connection with the execution of these contracts." ¶ 33(c). The four individuals alleged to have breached the fiduciary duty are Frank Walker, John Hammond, Clarence Williams, and Jack Kapp. ¶ 33(b).

With respect to the claims concerning Jack Kapp and Clarence Williams, we dismiss because the allegations themselves preclude tolling the statute of limitations—the Williams transaction is alleged to have been revealed in 1923, and Kapp is nowhere alleged to have been Smith's "agent" in any "conflicting" role. As to the claim concerning John Hammond, we grant defendant summary judgment for the same reasons we did in Count I. As for the Frank Walker claim, both Counts I and II depend on ¶¶ 17 and 18 for the allegations of Walker's "breach of fiduciary relationship," hence precisely the same deficiencies are present as in Count I. Because neither the allegations of these paragraphs nor the affidavits in answering papers set forth facts sufficient to support a reasonable inference that the alleged breach of the principal-agent

relationship between Smith and Frank Walker was so concealed that it was not discoverable by a reasonably diligent principal until at least 1969, we must dismiss them, or alternatively grant summary judgment for Columbia.

■ Plaintiffs' other justification for asking us to determine the validity of these sexagenarian contracts is that their terms were "unconscionable." ¶ 33(d). If unconscionability were a tolling doctrine it would be astounding indeed, and our courts would be inundated by a plethora of ancient contract actions. While unconscionability can be the substantive basis for invalidating a contract upon which a timely action has been filed, it cannot under any theory be the basis for tolling the statute of limitations.

■ Finally, and without repeating the analysis, we note that the real party in interest arguments which were our alternative basis for the dismissal of Count I apply equally to Count II, also requiring dismissal.

For the foregoing reasons, Count II will be dismissed in its entirety.

### IV. *Count III—Copyright Infringement*

Count III of the complaint reads as follows.

#### COPYRIGHT INFRINGEMENT

36. By reason of defendants' actions as aforesaid, defendants have produced numerous recordings and copies of works composed and authored by Bessie Smith without valid authorization to do so.

37. By such actions, defendants have infringed the copyrights of Bessie Smith and her heirs, the plaintiffs herein, and have committed unfair trade practices, all to plaintiffs' great detriment and loss.

38. Defendants have in addition, allowed and are allowing others to copy the works of Bessie Smith in various ways without proper authority from plaintiffs as heirs to Bessie Smith, to plaintiffs' further detriment and loss.

39. In addition, defendants have purportedly entered into copyright agreements with the late Jack Gee, Sr. on November 11, 1940, with respect to the right of Columbia to make recordings of songs by Bessie Smith entitled "Young Woman's Blues" and "Off Your Head Blues" and possibly have entered into other similar contracts for other songs, all with the knowledge by Columbia that Jack Gee was unable to comprehend the legal nature of the contracts, and which were signed, on information and belief, by Jack Gee, Sr. in reliance on the advice of agents and counsel for Columbia, contrary to his own interests. For this reason, and because such contracts are unconscionable in the nominal payment terms for the rights granted thereunder, these contracts are null and void and the defendants have infringed and continue to infringe the copyrights of Bessie Smith and her heirs under such contracts, all to plaintiffs' great detriment and loss.

40. From and after February 15, 1972, statutory copyright protection is now available for the copyrighting of records themselves. On information and belief, Columbia has copyrighted Bessie Smith's albums issued by Columbia after this date, all without the consent or authorization of the heirs of Bessie Smith, and without payment to the heirs, plaintiffs herein. By these actions, the defendants are infringing the statutory copyright rights of plaintiffs herein and are continuing to do so, all to plaintiffs' great loss and detriment.

■ As was the case with the two preceding counts, our initial inquiry is to locate which of the claims in this count appear to be time-barred, and to scrutinize as to those the tolling justification that plaintiffs have offered. We immediately encounter the problem that none of the foregoing allegations provide sufficient notice under Rule 8 to permit this Court to determine which copyright infringements occurred between 1923 and 1933, when Bessie Smith presumably wrote the songs at issue, and which alleged infringements occurred subsequently. We examine the five paragraphs *seriatim*.

Paragraph 36 only states a claim when read with paragraph 37: the mere fact that Bessie Smith, sometime before her death in 1937, "composed and authored" songs (¶ 36) would not state a claim for copyright infringement without the intimation in ¶ 37 that Bessie Smith retained a legally-protected right in those songs by virtue of the copyright process. (Even implying such an allegation is insufficient to confer standing on plaintiffs in this suit absent an allegation stating how present plaintiffs came to acquire those rights.) Hence we read the two paragraphs as one allegation that Columbia Records and CBS, Inc. have infringed copyrights originally obtained by Bessie Smith and we assume arguendo plaintiffs could demonstrate the means by which they acquired these rights.

Neither ¶ 36 nor ¶ 37 refers to specific copyrights. Similarly, neither paragraph mentions any specific act of infringement committed by defendants. Moreover, copyrights are mentioned in only two other places in the entire complaint: ¶ 20, which apparently alleges a fraudulent scheme by defendants to obtain licensing agreements for themselves for songs in which Bessie Smith owned the copyrights; and ¶ 25, which makes essentially the same allegation.

■ The allegations of ¶¶ 36 and 37, whether read alone or in conjunction with those in ¶¶ 20 and 25, are plainly insufficient to meet plaintiffs' pleading burden under Fed.R.Civ.P. 8. The Rule 8 requirements have been expressly applied to copyright actions by virtue of the Supreme Court Rules of Practice for Proceedings in Copyright. *See* 2a Moore's Federal Practice ¶ 8.17[7] at 1766 (2d ed. 1978). To be sufficient under Rule 8 a claim of infringement must state, *inter alia,* which specific original work is the subject of the copyright claim, that plaintiff owns the copyright, that the work in question has been registered in compliance with the statute and by what acts and during what time defendant has infringed the copyright. *Id.* at 1767.

Plaintiffs have done none of this in ¶¶ 36 and 37. Form 17, appended to the Federal Rules of Civil Procedure, illustrates a proper complaint for infringement of copyright and unfair competition.[22] To have complied with the rule (and the form), plaintiffs would have had to identify *each* song composed by Bessie Smith which is the subject of the copyright claim, and for each song they would have had to allege that *they* presently own the copyright. To allege that Bessie Smith once owned the copyright is insufficient; it is *plaintiffs' present ownership* that must be pleaded. Plaintiffs must also allege that each work is suitably registered, provide registration numbers and state by what act or acts and on what dates defendants infringed the copyrights.

■ Since none of this has been done, we are again constrained to note that plaintiffs have already had three bites at the apple. In view of the ample discovery allowed and the extensive opportunity to specify their claims, the interests of even minimal judicial decorum dictate that plaintiffs not be given a fourth. We so exercise our discretion.

■ Courts have determined the above requirements to be a fair Rule 8

pleading burden to place on a plaintiff at the commencement of litigation. We are far down the road from there in this suit. The *original* complaint in this lawsuit sought to itemize, by exhibit in a verified complaint, the forty copyrighted songs of Bessie Smith which were the subject of the copyright claim. It was represented to the court that the Copyright Office had been contacted to provide additional information, which would be supplied in due course. That was well over three years ago. To repeat, now two amended complaints have intervened, two sets of lengthy interrogatories have been answered for plaintiffs' benefit and plaintiffs have taken depositions. They have had ample time to contact the Copyright Office, and to particularize their claim so defendants would have sufficient notice to permit them to file a responsive pleading. Yet their present complaint—an unverified one—rather than becoming more particular, has become more murky, vague and illusive, failing to identify even a single copyrighted song at issue. Paragraphs 36 and 37 must therefore be dismissed.[23]

■ There is an alternative basis for this result. Two assignments appear of record, supported by affidavit of counsel. One

22. Official Form 17 applies to copyright of a book. For an example of an appropriate complaint in a claim for "infringement of copyright—mechanical duplication of recording," see the complaint in *Elektra Records Co. v. Gem Electronic Distributors, Inc.*, 360 F.Supp. 821 (E.D.N.Y.1973), *printed in* 1A Bender's Federal Practice Forms, Form 223.1 at 446.4 (1978). In that complaint, each copyrighted sound recording was identified in Schedule A, attached to the complaint. The certificate of registration for each sound recording at issue, obtained from the Register of Copyrights, was attached as Schedule B to the complaint.

23. The insufficiencies in these paragraphs are even greater than we have already set forth. Because it appears from plaintiffs' memoranda that they may not only be making a claim under the federal copyright statute, 17 U.S.C. § 101 *et seq.*, but also under a theory of "common law of copyright," they have not even alleged the specific source of rights they believe to support their claim, whether federal or non-federal. However, whether they are claiming infringement by virtue of the federal copyright statute or some other body of law, the same requirements of identifying every song in

question, of specifying plaintiffs' present claim to ownership of each song, and of particularly identifying the form of infringement of each song are applicable.

Alternatively, plaintiffs may be making a claim based on songs Bessie Smith "authored and composed" and for which she might have received copyright protection but never did, because of some action by the defendants. In short, plaintiffs may be alleging a scheme to defraud Bessie Smith of copyright protection she might have enjoyed. This is nowhere alleged in ¶¶ 20, 25, 36, or 37, but seems to be what plaintiffs are driving at by passages of their memoranda. However, to the extent such a scheme forms the basis of their claim they have not, despite ample opportunity to do so, described the scheme with the particularity required by Rule 9(b), *i. e.* a description of each song involved and of facts which would permit a reasonable inference that the scheme was *concealed* on a continuous basis without the reasonable possibility of detection until the appropriate time before commencement of this lawsuit.

was given by Jack Gee, Sr., to Empress Music Co. in 1952, and in it he conveyed all his *present and future* copyrights in Bessie Smith songs to Empress; the other assignment, similar but possibly broader, was made by Jack Gee, Jr. to Empress in 1975, after commencement of this lawsuit. We cannot determine the precise legal effect of those assignments because of the vagueness of plaintiffs' present allegations. However, a reading of both of these documents reveals their expansive, indeed, all-encompassing character. It is difficult to see anything excluded from their scope, and certainly plaintiffs have pointed to nothing. On this basis alone Columbia is entitled to summary judgment on Count III.

■ We turn, then, to ¶ 38. These allegations appear to involve defendants as licensees somehow impermissibly sublicensing rights in violation of licensing restrictions in their agreement with the copyright holder. No other allegation in the complaint hints at such activity. The activity alleged in ¶ 38 could have occurred at any time between 1923 and 1975 (the time is unspecified), with any organization or individual (the person or persons that defendants have "allowed to copy" the works is unspecified), in connection with any song (that too is unspecified). We would suggest that this pleading is simply inexcusable,[24] *especially* in view of the discovery already taken when this present complaint was filed, but for our conclusion that plaintiffs just cannot do any better. Consistent with our previous discussion, this allegation too will be dismissed.

■ Paragraph 39 is a claim for rescission of two contracts made in 1940. There is no allegation of misrepresentation by defendant, hence no allegation of fraud. Nor is there any allegation of breach of agency. Therefore the only tolling justification that would be available is "fraudulent concealment" under *Overfield* and *Knuth*. No tolling justification is offered in ¶ 39 save "unconscionability," which we have already re-

jected as a possible justification. Again, consistent with our previous discussions, and in light of plaintiffs' failure after all this time to set forth factors permitting an inference of continuous "fraudulent concealment," this allegation too must be dismissed.

■ Finally, ¶ 40 is insufficient to meet plaintiffs' burden of pleading copyright infringement under Rule 8. *See* discussion of Official form 17 and citations to *Moore*'s and *Bender*'s, *supra*. Plaintiffs do not even allege their *ownership* of the "statutory copyright rights" at issue, nor do they identify the songs as to which infringement is claimed or the means by which defendants allegedly infringed the copyrights. Plaintiffs have had ample opportunity to make satisfactory averment; we conclude they cannot do so. In accordance with our previous discussion, this claim must also be dismissed.

For the foregoing reasons, Count III will be dismissed in its entirety; alternatively, Columbia is entitled to summary judgment.

## V. *Unfair Competition, Common Law Copyright*

### A. *Introduction*

Count IV alleges a variety of claims which sound in the law of both business tort and property. They are set forth in ¶¶ 41–43 as follows:

### COUNT IV

#### UNFAIR COMPETITION, UNFAIR TRADE PRACTICES AND MISAPPROPRIATION OF PROPERTY INTERESTS IN BESSIE SMITH'S RECORDS

41. By reason of defendants' actions as aforesaid, the defendants have committed unfair trade practices, unfair competition, and have otherwise misappropriated the property interests of the heirs of Bessie Smith in the records made by her

---

24. It is not "notice pleading" when compared with examples of actual complaints in copyrights actions, collected in 1A Bender's Federal Practice Forms, Forms 222 to 225.2 at 435–50.-17 (1978).

during her lifetime. Defendants' actions include the posthumous issuance of one or more records by Bessie Smith which had originally been rejected by Columbia during her lifetime and for which no compensation was paid to her or to her heirs at any time.

42. In addition, without authorization or consent to do so from the heirs of Bessie Smith, defendants in 1951, and again in 1970–1972 have re-recorded Bessie Smith's songs by technological means that were unknown during Bessie Smith's lifetime, the products of which were also totally unknown at the time Bessie Smith made her original records. Bessie Smith made her records initially through the acoustical method of singing into a large horn, and later electronically through a microphone in order for Columbia to produce 78 rpm records with one song on each side which were sold to the public for 75¢ or, on the Okeh Record label at 35¢. Both Bessie Smith and Columbia understood the then present use for which Bessie's recordings were intended when they entered into their contractual arrangements. In contrast, four long-playing high-fidelity albums containing 48 selections by Bessie Smith were re-recorded by Columbia in 1951 by use of additional means to "improve" and change the sound of the earlier records by amplifying them with artificial echo and the introduction of other high fidelity recording techniques. In contrast to a 75¢ or 35¢ 78 rpm record, each of the four 1951 LP Bessie Smith records had a list price of $5.98. In similar fashion, five long-playing double record albums containing all 160 existing selections by Bessie Smith were issued by Columbia during 1970 and 1972 at a list price, on information and belief, of $5.98 per double album. Surface noises on the original records by Bessie Smith have been minimized on the new recordings and other changes have been made by means of new technology in electronic recording. Moreover, the albums produced in 1951 and in 1970–1972 were manufactured in part based upon records which Columbia did not own but had assembled from private record collectors, because Columbia no longer had master records or matrices for many of the songs included on the album.

43. The heirs of Bessie Smith have a property right in her rendition as recorded. The changes in those renditions, and the assembling of those songs on long-playing albums, for commercial sale to the public at a list price which is 8 to 17 times as great as the price of records when the songs were originally recorded, all without the authority or consent of the plaintiffs, constitute an unauthorized use of those songs and records which was never contemplated by Bessie Smith and Columbia when they entered into their contractual arrangements. Defendants' commercial use of such records to produce and sell such long-playing albums constitutes unfair competition, unfair trade practices, and misappropriation of property, of Bessie Smith and her heirs.

We note at the outset that the real party in interest problem discussed *supra* infects Count IV as well, and would alone require dismissal. However, we do not rest on that point.

In contrast to Counts I and II (which depend on rights of Bessie Smith's which were allegedly both acquired and breached during the period between 1923 and 1933), Count IV alleges a cause of action based on rights *acquired* between 1923–33 but not *breached* until the early 1950's and then again in the early 1970's, both times when Columbia issued long-playing re-recordings of Smith's songs. And in contrast with Count III (which depends on Bessie Smith's rights in songs she composed), Count IV is based on rights allegedly obtained by virtue of Smith's *artistic performances* in both the recording sessions with Columbia and the records issued as a result of those recording sessions. According to plaintiffs, these rights are not based on Bessie Smith having composed any particular song, rather, they derive from her style and manner of singing the blues.

These claims are not cognizable under any federal law existing at the relevant time. "Title" to songs (*i. e.* the nine for which allegedly less than full compensation was made), outside of the specific kind of protection afforded by the copyright scheme, has never been a concern of federal law. As to the artistic or performing rights in the 160 other recorded songs, federal copyright law has historically excluded a singer's performance rights from protection. Indeed, sound recordings themselves were totally excluded from federal copyright protection by unanimous court construction of the 1909 copyright statute, 17 U.S.C. § 1 *et seq. See Capitol Records, Inc. v. Mercury Records Corp.*, 221 F.2d 657 (2d Cir. 1955). *A fortiori* a performer could not have obtained any copyright protection for his or her style of making those sound recordings. It was not until amendment of that statute, effective in 1972, that sound recordings themselves could be copyrighted, *see* 1 *Nimmer on Copyrights* § 2.10[A] at 2–139 (1978), but that amendment excluded a singer's performance rights from protection. *See* Waxman, *Performance Rights in Sound Recordings*, 52 Texas L.Rev. 42, 46 (1973). It appears that the current copyright statute, effective January 1, 1978, may alter the law. *See* 17 U.S.C.A. § 102 (1977), which reprinted the Notes of the Committee on the Judiciary, House Report No. 94–1476, U.S.Code Cong. & Admin. News 1976, pp. 5659, 5669:

> The copyrightable elements in a sound recording will usually, though not always, involve 'authorship' both on the part of the performers whose performance is captured and on the part of the record producer responsible for setting up the recording sessions, capturing and electronically processing the sounds, and compiling and editing them to make the final sound recording.

But it is clear beyond cavil that federal law did not protect any such rights of performers between 1923 and 1933, when Bessie Smith's rights would have to have vested under the theory of Count IV. Therefore, Count IV must in its entirety depend on state law.

A difficult question is which state law to apply. In ¶¶ 41–43 there are a number of discrete legal issues, each of which demands separate choice of law analysis. The broad claim is that Bessie Smith obtained certain rights in the way she sang the blues in the 1923–33 recording sessions, and that defendants have violated these rights. These violations, allegedly occurring in the early 1950's and again in the early 1970's, are described more specifically in plaintiff's papers as follows: (a) re-issuing in the 1950's and 1970's one song for which Smith was never paid, and eight others for which she was only partially paid; (b) using new technology to re-record all the songs on all the albums; (c) using new technology to assemble long-playing records, as opposed to the original 78 rpm recordings; and (d) issuing the long-playing albums and charging prices for them much higher than the original 1923–33 records cost. In plaintiffs' view, their consent was necessary before any of the foregoing was undertaken.

To aid our analysis, plaintiffs' claim must be broken down further. As to the 160 songs Bessie Smith recorded for Columbia between 1923–33 and for which plaintiffs admit she was paid, plaintiffs claim she obtained a shared property right with Columbia: defendants had the right to produce records of her performances at the time, but had no right to re-record the songs years later using sophisticated technology, since that infringed her shared property interest acquired by virtue of her original artistic performances. As to nine specific songs, plaintiffs' contention is analytically different. Plaintiffs claim Smith was not paid at all for one of the songs ("At the Christmas Ball", which was never released during her lifetime), and only partially paid for eight others (all released during her lifetime). All nine songs were re-recorded and released in albums years later. As to these, plaintiffs assert defendants never acquired any property rights, and title to these songs remained with Bessie Smith and devolved to her heirs, present plaintiffs.

Our initial task is to identify, under Pennsylvania choice of law principles, what state law should be chosen to govern the various legal issues raised by Count IV. One possibly interested jurisdiction is Pennsylvania, where present plaintiffs live, where Bessie Smith lived for most of her life as a performer (including the time she made the recordings for Columbia), and where she was domiciled at the time of her death (this fact might have some impact on the choice of what law governs descent and distribution, and survival of causes of action to Smith's estate). The other possibly interested jurisdiction is New York, where defendants are incorporated, where they have their principal place of business, where the recording sessions took place, where the contracts governing Smith's performing rights in those recordings were made and performed, and where the 1970's albums (and presumably the 1950's albums as well) were electronically re-recorded.

Our first step is to determine whether there actually exists a conflict between the laws of New York and those of Pennsylvania on a material legal question, such that we would be required to refer to Pennsylvania choice of law principles for a solution. Hence, we shall consider both jurisdictions' substantive laws in the following sections. (However, as stated *supra*, we need consider only Pennsylvania's statute of limitations for any question of time-bar, since Pennsylvania classifies statutes of limitations as "procedural," not "substantive"). Before doing so, it is necessary to discuss the record evidence that provides a background for understanding Count IV.

We begin with what defendants assert to be the operative written contracts. Defendants introduced several contracts of the printed form variety, all entitled "Exclusive Artists' Flat Payment Agreement." These contracts ostensibly governed the relationship between Bessie Smith and Columbia Phonograph Company, Inc. with respect to Smith's recording performances. The earliest is dated January 22, 1976, well after Smith had recorded many records for Columbia, but it refers to an earlier agreement dated December 22, 1923. Each contract is unsigned, either by Bessie Smith or by any Columbia official. The terms, typewritten onto the printed forms, are that Bessie Smith was to record a minimum of twelve records for Columbia during the subsequent year, with no stated maximum. For each "accepted" record—*i. e.,* one which Columbia deemed acceptable for recording—Bessie was to be paid $200. The fourteenth paragraph reads in part: ". . . it being understood that Columbia will act promptly in passing upon said first acceptance and will not unreasonably withhold its acceptance.

Other paragraphs flesh out the arrangement: Columbia reserved "the sole right of determining what is an acceptable master record;" and "The artist shall record for Columbia's acceptance the number of selections hereinafter stated, and shall repeat and record each selection as many times as may be reasonably required by Columbia for the purpose of obtaining an acceptable master record and matrix thereof." Though it is nowhere explicitly stated, it is the clear import of the contract that Smith was not to be paid for records which were "not accepted," or otherwise put, "rejected." The other contracts of record are virtually identical to the 1926 one. They employ the same form, but different amounts are typed in. (The 1928 contract contains the same $200-per-acceptable-record amount; the 1930 contract a $125-per-acceptable-record amount, with a $1,500 guarantee).

Plaintiffs challenge the validity of these contracts, alleging that they were "collusive," and that Bessie Smith neither saw them nor consented to their terms (¶ 24). In dealing with the cross-motions for summary judgment, we will determine if there is a disputed issue of material fact in Count IV as to whether any of the contracts governed the legal relationship between Bessie Smith and Columbia at issue in Count IV.

The record also contains photocopies of the original ledger sheets from Columbia Records' account books for the years 1923–31. Their status in the record is very dif-

ferent. Plaintiffs have specifically relied on data in those ledger sheets as being an accurate reflection of payments actually made to Bessie Smith. (*See* Exhibit C to plaintiffs' Memorandum in Opposition to Defendants' Motion to Dismiss, discussed *infra* at p. 82, part "A"). Plaintiffs have never challenged the validity or accuracy of the information. Indeed, they contend that the revelations of those ledger sheets are grounds for imposing a variety of kinds of liability on defendants. Defendants do not dispute the accuracy or validity of the ledger sheets either, hence we may take the ledger sheets as stipulated record evidence from which legal conclusions can be drawn.

The ledger sheets show payments to Bessie Smith for recording approximately 160 songs between April 1, 1923, and November 20, 1931. Most of the ledger sheets contain handwritten entries of the name of the song, the date on which it was "made" (apparently meaning date recorded), the date on which it was "o.k.'d" (probably meaning date accepted by Columbia), the date Bessie Smith was paid, the amount paid and the "month listed" (which probably means the month the record was listed in the record catalogue). In the left margin of the ledger sheets are various terms such as "contract—dated," "years" (probably meaning term for which contract endured), "commencing" (date contract started), "ending" (termination date of contract), "recordings" (apparently the guaranteed minimum number of recordings), "royalty," "advance on-account," "flat payment," "renewal notice" and "remarks." One ledger sheet under "remarks," states "Guarantee $2,400."

The ledger sheets show payments for the vast majority of the 160 records. For a few, under the column labeled "Date o.k.'d," the word "reject" is written, and lines are drawn in the appropriate columns indicating no payment was made to Bessie for those songs.

■ In our view, evidence in the ledger sheets is sufficient under both New York and Pennsylvania law to constitute an "implied contract in fact." In other words, we can imply from the fact (undisputed by plaintiffs and defendants) that Columbia made a series of payments for a series of recordings by Bessie Smith, that Bessie Smith and defendants had a contract (presumably oral) by which defendants agreed to pay her at least the amount shown on the ledger sheets. Implied in fact contracts are recognized under the laws of both possibly concerned jurisdictions. *See American La France Fire Engine Co., Inc. v. Borough of Shenandoah*, 115 F.2d 866 (3d Cir. 1940); *Martin v. Campanaro*, 156 F.2d 127 (2d Cir.), *cert. denied*, 329 U.S. 759, 67 S.Ct. 112, 91 L.Ed. 654 (1946).

This implied in fact contract must be carefully limited to its terms, however. We do not think the parties have stipulated to anything except the making of payments actually reflected on the ledger sheets. For example, where the word "reject" appears in the ledger sheet instead of payment, we cannot interpolate the legal significance of this word—defendants may or may not have had a legal right to reject the payment, and rejecting the payment may or may not have given them the right to keep the master recording and use it in the future—all we can infer is that Columbia in fact made no payments for those songs at the time they were recorded.

With this background we turn to the five discrete kinds of rights at issue in Count IV: (1) the rights acquired in the eight songs listed in Exhibit C of Plaintiffs' Memorandum in Opposition to Defendants' Motion to Dismiss, for which the ledger sheets allegedly indicate partial payment (we have deemed this to be at issue in Count IV although not alleged therein); (2) the rights to the song "At the Christmas Ball," rejected at the time of its initial recording on November 17, 1925, and issued for the first time in 1951, and subsequently in 1972; (3) the rights to control the technology used in production of the records; (4) the rights to control the prices of the records; and (5) the rights to control the packaging of the records. Categories (1) and (2) are the subjects of cross motions for summary judgment. Only defendants have moved for

summary judgment or dismissal as to the other three categories. Categories (3), (4), and (5) will be considered together because of their similarity. As noted before, our examination in each case will proceed under both New York and Pennsylvania law; only in case of an actual conflict will we have to make a choice under Pennsylvania choice of law methodology.

### B. *Partial Payment for Eight Songs*

Plaintiffs have identified eight songs and have explained the basis of their claim respecting those eight songs as follows:

The original Columbia ledger sheet showing payments to Bessie Smith states, *inter alia* :

Contract term: 7–11–30 to 8–11–31: Flat payment $125.
Guarantee $1500.

| | | Date Paid | Amount Paid |
|---|---|---|---|
| 1. | Hustlin Dan | 8/11/30 | $125 |
| 2. | Black Mountain Blues | 8/11/30 | $125 |
| 3. | In the House Blues | 6/19/31 | $125 |
| 4. | Long Old Road | 6/19/31 | $125 |
| 5. | Blue Blues | 6/19/31 | $125 |
| 6. | Shipwreck Blues | 6/19/31 | $125 |
| 7. | Need a Little Sugar in My Bowl | 11/27/31 | $125 |
| 8. | Safety Mama | 11/27/31 | $125 |
| | [Total Paid] | | [$1000] |

The Columbia ledger sheet containing this information is reprinted in full as Appendix A to this opinion. The ledger sheet is the last one (out of a total of eight) regarding Bessie Smith. The eight songs listed on the ledger sheet appear to be the last eight she recorded for Columbia as part of the continuous contractual arrangement that existed between 1923 and 1931. (It was not until 1933, when John Hammond persuaded Columbia to record four more records, that she again sang for defendants. *See* Hammond Deposition.)

The ledger sheet shows that $125 was paid to Smith for recording each of the eight songs in question. In the left margin, under "guarantee," the number "1500" appears. Under the heading "recordings" the number "12" appears. Plaintiffs' claim is grounded on the theory that Smith had been guaranteed $1,500 for this recording session (as evidenced by the amount written

in the left margin), but that she was only paid $1,000 for the eight recorded songs (8 times $125 per recording). Hence, she was owed $500 for the recording session. Upon that claim plaintiffs have built a complicated scaffolding. They reason that the money owed became an asset of her estate, but more importantly, that defendants' failure to pay this amount prevented them from obtaining title to and the concomitant right to issue the eight records in question (which defendants nevertheless did issue in the early '30's, and again re-issued in the '50's and '70's). This all means, in plaintiffs' view, that title to these records never passed to Columbia, that Columbia has misappropriated property belonging to Bessie Smith's estate and that plaintiffs are entitled to recover for the misappropriated property.

■ Although the allegations in Count IV do not expressly raise any claim based on defendants' alleged partial payments, plaintiffs have moved for summary judgment on this issue, so we elect to treat it as though it had been alleged in Count IV. *See* discussion of Count IV in plaintiffs' memorandum in opposition to defendants' motion to dismiss at 18–23; *see also* ¶ 3 of plaintiffs' cross-motion, which incorporates Count IV.

■ We cannot possibly grant summary judgment for plaintiffs on this issue. In order to do so, we would have to find conclusively that the contractual guarantee of $1,500 was due Smith even if she recorded only eight songs. We cannot so conclude, there being insufficient evidence on that point in this record. Indeed, it appears more likely that the contractual guarantee did not come into effect unless Smith recorded twelve selections (*see* marginal note of "12" under heading "recordings"), which condition she did not fulfill. We do not know whether the guarantee ever became operative; or if it did become operative whether Smith orally waived it; or if, as plaintiffs maintain, it became operative after only eight recordings, and was in fact due and owing to Smith. All are possi-

bilities. The record is inadequate to decide this question, containing as it does only the ambiguous entries on the ledger sheet itself. Therefore, we will deny plaintiffs' motion for partial summary judgment on the basis of these eight recordings in 1930 and 1931.

■ Turning to defendants' cross motion for dismissal or in the alternative summary judgment, we find that under the ledger sheet entries Bessie Smith was clearly paid $125 for each of the eight songs she recorded. This is stipulated by the parties. Otherwise put, Columbia clearly "accepted" each of these recordings, and issued records for each of the eight songs recorded during 1930 and 1931. See Defendants' Answers to Plaintiff's First Set of Interrogatories, Answer 17 at 14–15. Accordingly, Smith must be charged with the knowledge that Columbia exercised control over these recordings, and used them for its own profit-making. If she *did* have an oral contract guaranteeing her $1,500 for this recording session, and if she was in fact owed a $500 balance under this contract, then that contractual debt became due and owing sometime during 1930 or 1931. Smith would have had to have sued on this debt (or her estate would have had to shortly after her death in 1937).

No facts have been alleged, and none appear of record, that indicate any concealment by defendants, hence there is no possibility of tolling the statute of limitations. Therefore, a claim of any money owed to Smith under the alleged $1,500 guarantee— and of course any other claim arising from the alleged failure of full consideration during 1930–31, (*e. g.* that the recording contract should be rescinded, that title to the original matrices should be returned to Smith's estate's control, that defendants should be enjoined from issuing the eight records in question or should make an accounting to her or her estate for any profits received)—should have been brought in a lawsuit soon after 1931. Any such claim has long since been foreclosed under Pennsylvania's six year statute of limitations. 12 Pa.Stat.Ann. § 31 (Purdon). For that reason, we conclude plaintiffs' claim is conclusively time-barred, and having gone outside the pleadings to so determine, we grant defendant partial summary judgment on this issue.

### C. *"At the Christmas Ball"*

The second discrete claim in Count IV, also a subject of plaintiffs' cross motion for summary judgment, concerns the song "At the Christmas Ball." The history of this song is very different from the eight records discussed above.

Unlike the eight above, "At the Christmas Ball" was "rejected" by Columbia at the time the recording was made. It appears on the ledger sheet marked D–17 as a recording made on November 18, 1925. We have attached that ledger sheet as Appendix B to this opinion. The title of the record has been crossed out thereon, and the abbreviation "Rej" written in the column headed "O.K.'d." The columns showing money paid to Bessie Smith is blank, as are the columns showing the date payment was made and the date the record was listed. (We have placed an arrow on Appendix B to highlight the entry "At the Christmas Ball.") Defendants, however, have not admitted that Smith was not paid, stating only she "may not" have been paid. See Defendants' memorandum in support of their motion to dismiss, at 23, note 13.

No recording of "At the Christmas Ball" was issued before Bessie Smith's death. It was not until 1951 that it was first issued, in Columbia LP Album CL 857, volume 3 of the "Bessie Smith Story—Golden Era Series." [25] The jacket notes for the 1951 album (Exhibit F–3) state: " 'At the Christmas Ball' was so far removed from the successful type of Bessie Smith record that it was left unissued until the writer dug it out of the files." The record was re-record-

---

25. Paragraph 10 of the Second Amended Complaint *erroneously claims the first issuance was in 1971; however, plaintiffs' memorandum at Exhibit B claims it was first issued in 1951, and

Exhibit F–3 to the same memorandum is a photocopy of the record cover for the 1951 album, conclusively showing its issuance on that date.

ed and re-issued in 1972 as part of Columbia LP § 31093 "Nobody's Blues But Mine."

Plaintiffs' claim that since Smith was never paid initially for this performance, Columbia had no right to issue the record of "At the Christmas Ball" either in 1951 or 1972; that such issuance constitutes a misappropriation of Smith's and her heirs' property; and that defendants must make an accounting to her heirs, instant plaintiffs, for any profits received.

■ We examine first plaintiffs' motion for summary judgment. In order to grant such a motion, we would have to conclusively find that by "rejecting" the song initially on November 18, 1925, defendants were prevented from acquiring title to use the record subsequently in 1951 or 1972. There is simply insufficient evidence on which to base such a conclusion. The unexecuted form contracts which defendants have introduced are ambiguous on this point. Some paragraphs appear to grant Columbia the complete ownership rights to the matrices of all recordings, regardless of whether Bessie Smith was paid the flat rate for any given recording, while other paragraphs appear to require Columbia to pay Smith the flat rate (in the case of "At the Christmas Ball" it would have been $200) for each and every song in order to obtain the right to use the matrix to make a commercial record. In any event, plaintiffs challenge the very existence and validity of these unexecuted contracts, hence we cannot consider them to resolve this question. Plaintiffs have pointed to no evidence—contracts, writings, affidavits or anything else—which would allow us to conclude that Columbia had to pay Bessie Smith $200 in order to obtain title to the matrix for "At the Christmas Ball." It simply is not a self-evidence proposition that they had to do so. (Even if in footnote 13 of their memorandum, defendants are deemed to have admitted the $200 payment was never made, they have never admitted what legal consequence, if any, flowed from this non-payment.)

Though plaintiffs' hypothesis is plausible, it is equally plausible that defendants and Bessie Smith orally agreed that Columbia could own *all* the matrixes of any given recording session (including, therefore, "At the Christmas Ball"), so long as they paid her the "guaranteed amount" for the recording session. The ledger sheet on which "At the Christmas Ball" appears shows a "Guarantee" of "$2,400." The ledger sheet shows payments of $4,900 for that recording session. If our hypothesis, rather than plaintiffs', is the correct interpretation of the legally-binding agreement between the parties, defendants would not have wronged Bessie Smith's estate by issuing "At the Christmas Ball" in 1951 or 1972, because they would have obtained full rights to the record by virtue of having payed more than the guaranteed amount for the 1930–31 recording session. At trial, after all the evidence has been introduced, we could conceivably decide between these competing hypotheses (or any others that might appear) and find that defendants are or are not liable. But perusing the naked face of the ledger sheet alone, we cannot say plaintiffs' hypothesis is conclusively correct, which we would have to do in order to grant plaintiffs' motion for summary judgment. Therefore, we will deny that motion.

■ We turn to defendants' motion for summary judgment. In doing so, we will consider the record evidence in the light most favorable to plaintiffs, the party opposing the motion. *See Janek v. Celebrezze*, 336 F.2d 828 (3d Cir. 1964). Indeed we will assume arguendo, for purposes of this motion, precisely what we could not assume above for purposes of plaintiffs' cross motion: that the ledger sheets conclusively show defendants' failure to pay for "At the Christmas Ball" to mean that defendants did *not* obtain title to the matrix for "At the Christmas Ball," that title to the record matrix remained with Bessie Smith, and that defendants committed a wrong against her estate (to which her title to the matrix devolved arguendo) by issuing albums containing "At the Christmas Ball" in 1951 and again in 1972. Before addressing the question we note that whether we style this wrong as a "misappropriation of

property" or an "unfair trade practice," or some other designation is irrelevant. (It apparently cannot be styled as a common law "conversion," since the kind of intangible property right involved in this claim cannot be the subject of conversion even under a modern, expanded definition of that theory. *See* W. Prosser, *Law of Torts* at 81–82 (4th Ed. 1971) ).

▮ Looking to the record evidence under these pro-plaintiff assumptions, several matters are clear. First, the claim based on the 1951 record album issuance is time-barred in an action filed in 1975. Columbia did not conceal the fact that it issued the record in 1951, nor did it conceal the fact that "At the Christmas Ball" had been previously unissued during Bessie Smith's lifetime. *See* quotation from 1951 record jacket *supra* at p. 651. Moreover, there is not other basis for tolling the statute of limitations. Therefore, plaintiffs were required to bring suit on this claim within six years after the 1951 issuance. Because suit was not timely brought, we will grant defendants' summary judgment on this claim.

The 1972 re-issuance presents a different question. The mere fact that someone commits a tort in 1951 does not necessarily mean he acquires the right to do it again in 1972. Thus although recovery on the 1951 wrong may be time-barred in a suit filed in the 1970's, recovery on the 1972 wrong may still be had. This is so unless an inference of "consent," "waiver" or some similar doctrine is drawn from the wronged party's failure to take action upon the 1951 tort, which would somehow give license to commit the subsequent action. The foregoing discussion references generalized tort principles. What affects plaintiffs' rights in the present situation is a property doctrine, to which we now turn.

▮ It is a well-known doctrine of property law that title will be transferred to one whose possession is originally unlawful, if that person openly and under color of right acts for a prescribed period of time as though he were entitled to ownership and continued possession. We obviously are referring here to the doctrine of "adverse possession."

▮ While adverse possession is generally thought of as a doctrine relating to titles in land, the doctrine applies with equal force to personal property, or at least to chattels. *See* III *American Law of Property* § 15.16, at 834 (1954); *Brown on Personal Property* § 16, at 33 (2d ed. 1955). As applied to chattels, the function of the doctrine is the same as when applied to land: "The modern adverse possession is a doctrine of inchoate title which may ripen into perfect title by the lapse of time." Bordwell, *Property in Chattels*, 29 Harvard L.Rev. 374, 378 (1915). Moreover, in the case of both land and chattels, the policy behind the doctrine is the same:

> Where an individual has for the years prescribed by the statute openly exercised the rights of an owner, thus giving rise to interests in the property affected on the part of vendees, licensees, and creditors, a strong public policy forbids adverse claimants from disturbing the existing situation by the presentation of ancient rights, concerning which proof may be difficult because of faulty recollection and the absence of essential witnesses.

*Brown on Personal Property, supra*, at 35. Both New York and Pennsylvania, the two possibly concerned jurisdictions in this suit, have recognized the applicability of adverse possession to chattels. *See, e. g. Priester v. Milleman*, 161 Pa.Super. 507, 55 A.2d 540 (1947); *Lightfoot v. Davis*, 198 N.Y. 261, 91 N.E. 582 (1910).

▮ The doctrine operates as follows: the time allowed the owner to recover possession of the real or personal property under the applicable statute of limitations is also the time for determining whether an adverse possessor's inchoate title has ripened into "perfect" title, good against the world, including the previous title-holder. As succinctly stated in *Brown on Personal Property*:

> While in form these statutes [of limitation] merely limit the right of the owner to bring legal proceedings to repossess his property . . . all but universally in

**654**

the United States the expiration of the statutory period has the effect, not only of barring the legal remedy, but also of extinguishing the owner's title and of transferring it to the adverse possessor or possessors.

*Id.* at 33. Or as stated in *Priester v. Milleman, supra,* in describing favorably a decision by a sister state's court,

The case must be understood as holding only that if during the running of the period prescribed by a statute of limitations relating to the recovery of chattels, they are held adversely to the true owner, the latter cannot recover them by the process of self-help after the expiration of the period, *and that upon the expiration of the period title vests in the adverse holder.*

161 Pa.Super. at 512, 55 A.2d at 543 (emphasis added). "A new title has arisen simply and solely because of the wrongful possession followed by the statutory extinguishment of the former title." III *American Law of Property* § 15.2, at 761 (1954).

■ Whether both New York and Pennsylvania would extend the notion of adverse possession to the intangible property right at issue in this case is an intriguing question. The first problem is how the state courts would classify the right. "At the Christmas Ball" apparently was not composed by Bessie Smith, and plaintiffs have nowhere alleged that she authored the song. We therefore must assume that plaintiffs are asserting a right in Smith's *recording* of that song; *i. e.* the style and manner in which she performed it in the recording session.[26] In our view, both Pennsylvania and New York would classify this kind of

right as a "chose in action," following *Brown's* description of that term:

[M]any rights do not . . . concern specific tangible things but consist of claims against third persons which, since they may be enforced by action . . . are of value and thus entitled to be termed property in the broader sense. Bank accounts, debts generally, corporate stock, patents and copyrights are common instances of this class of [intangible] property.

*Brown on Personal Property* § 7, at 13 (1955). While "choses in action" are usually "represented by a piece of paper" (*i. e.* savings pass-book, federal copyright certificate), the essence of a "chose in action" is a "right of property which . . . is essentially intangible in that it can ultimately only be claimed or enforced by action, not by taking physical possession." *Id.* at 11.

■ The question then becomes whether New York and Pennsylvania would apply the doctrine of adverse possession to choses in action. New York explicitly has. *See Lightfoot v. Davis,* 198 N.Y. 261, 91 N.E. 582 (1910). While we can find no case in which a Pennsylvania court has had occasion to consider this question, we find nothing in the case law, as exemplified by *Priester v. Milleman, supra,* which requires limiting the doctrine to tangible chattels. If faced with our case, we think a Pennsylvania court would extend the doctrine to choses in action, based on the weight of authority from sister states. *See, e. g., Manna v. Pirozzi,* 44 N.J.Super. 227, 130 A.2d 55, 59 (App.Div.1957) (questioned doctrine's application only because of existence of Uniform Stock Transfer Act, an arguably pre-emptive doctrine in that case, not applicable in

<hr>

**26.** Plaintiffs are not claiming any contractual rights. Rather, they are asserting Bessie Smith acquired the rights simply by virtue of singing the song. We assumed above, for purposes of defendants' motion, that the word "reject" in the ledger sheet meant not only that Columbia did not in fact pay Smith, but also that it obtained no rights to her recorded performance because it failed to pay her—in other words, we assumed the legal consequences most favorable to plaintiffs from the fact of non-payment. In parity, we also assume that both New York and Pennsylvania would recognize

and protect Smith's recording rights in the performance of "At the Christmas Ball" under common law copyright infringement or some similar doctrine. In other words, for purposes of this motion we assume Bessie Smith had protectible rights in her sound recording made in 1925. Moreover, we assume for purposes of this motion that both states would recognize this intangible property right as one that is *descendible, i. e.* not like a "reputational" interest which may not be capable of descent or distribution to heirs. *See* W. Prosser, *Law of Torts* at 898–901 (4th Ed. 1971).

this case); *Commercial Union Insurance Co. v. Connolly*, 183 Minn. 1, 235 N.W. 634, 636 (1931); *Lightfoot v. Davis, supra.* Our view that a Pennsylvania court would apply the doctrine to the specific chose in action involved in *this* claim (*i. e.* Bessie Smith's artistic performance) is further supported by the Pennsylvania Supreme Court's statement that "At common law, rights in a literary or artistic work were recognized on substantially the same basis as title to other property." *Waring v. WDAS Broadcasting Station*, 327 Pa. 433, 439, 194 A. 631, 634 (1937).

■ It is also important to determine which statute of limitations will apply. We find that where events which transpired in 1951 are at issue, New York would apply the three year statute of limitations which was then in effect for this kind of property action. N.Y.Civ.Prac.Law § 49(7) (McKinney). Pennsylvania would probably apply the six year statute of limitations in 12 Pa.Stat.Ann. § 31 (Purdon).[27]

The next question is whether under both New York and Pennsylvania law, the elements of adverse possession appear on this record. In Pennsylvania, it is required that there be "the peaceable, undisturbed, open possession of personal property, with an assertion of . . . ownership, for the period which bars an action for its recovery by the true owner." *Priester v. Milleman, supra,* 161 Pa.Super. at 513, 55 A.2d at 543–44. *Priester* apparently considers this formulation to be the functional equivalent of the familiar adverse possession litany: "actual, open, notorious, exclusive, hostile, uninterrupted, and always under a claim of right or title." *Id.* at 513, 55 A.2d at 544.

The New York counterpart opinion, *Lightfoot v. Davis*, adopts the identical test of "peaceable, undisturbed, open possession . . . with an assertion of ownership." 91 N.E. at 583.

■ III *American Law of Property* § 15.1 *et seq.* at 755–838 (1952) expands on these concepts. "Open" and "notorious" means such possession as will permit the true owner to have notice in order that "he may act to recover his property and protect his title from the adverse possessor." *Id.* at 768. There must be actual possession of the property, and not merely the *assertion* of possession without possession in fact. *Id.* at 765. But along with possession in fact is the concomitant requirement that the adverse possessor *claim* that he is legally entitled to ownership. In other words, there must be "nothing more or less than the existence of actual possession evidenced by acts of legal ownership." *Id.* at 835. This must exist continuously or uninterruptedly throughout the statutory period, in order that the true owner have actual or constructive notice during the whole time. *Id.* at 771. As to "hostility," this means simply that the true owner has not consented to the possession. *Id.* at 835.

■ We now apply these concepts to the evidence of this case. From 1925 (when "At the Christmas Ball" was recorded) to 1951 (when it was first issued), Columbia took no action to serve notice that it considered itself the sole owner of the recording. Whether we style its control during the 1925–51 period as that of "bailee" or otherwise, defendant can in no sense be

---

**27.** A difficult choice of law question is whether a Pennsylvania court would follow the usual rule and apply its own statute of limitations *regardless* of whether New York or Pennsylvania substantive law was chosen as to the doctrine of adverse possession. The reason it might not do so is that the traditional substance/procedure dichotomy in choice of law thinking is not followed when, as arguably occurs here, the substantive law in question contains the time limit for its commencement "embodied" in it. *See, e. g. Bournias v. Atlantic Maritime Co., Ltd.*, 220 F.2d 152 (2d Cir. 1955). In such cases, the law of the jurisdiction providing the substantive law is looked to for the time limit. Since the doctrine of adverse possession arguably embodies such a limit—title "vests" in New York in three years by virtue of the doctrine, whereas it "vests" in Pennsylvania in 6 years—we think it probable that a Pennsylvania state court would look to the law of the state providing the substantive rule for the applicable time limit as well. However, since we have not decided whether a Pennsylvania court would apply Pennsylvania or New York substantive law to this claim, we shall set forth both time limits.

considered an adverse possessor. However, there is no dispute that in November 1951, Columbia issued a four-volume album of all Bessie Smith's recordings, including, on Volume 3, "At the Christmas Ball." On the record jacket to Volume 1, Columbia stated: "She [Bessie Smith] left behind her 160 recordings (*every one of them, incidentally, the property of Columbia Records*)." (emphasis supplied). Assuming, as we have for present purposes, that title to the recording style of "At the Christmas Ball" had in fact by 1951 descended to Bessie Smith's estate, we can think of no more "open" or "notorious" assertion of ownership than the one Columbia made. Indeed, plaintiffs have *emphasized* this fact:

> Columbia has misrepresented to the world that Columbia is the exclusive property owner of all rights, title and interest to Bessie's recordings. In 1951, when Columbia re-recorded and re-issued a four long-playing record album series of Bessie Smith's stories, [sic] the liner notes for Volume I, . . . *prominently state* "She [Bessie] left behind her 160 recordings (every one of them, incidentally, the property of Columbia Records)."

Plaintiffs' Second Amended Complaint ¶ 29. (emphasis added).

This assertion of ownership, followed by issuance of "At the Christmas Ball" as one of the 160 recordings referred to, was also clearly "hostile" in the sense that the issuance of the record was not consented to by Bessie Smith's estate. Moreover, not only did Columbia assert a claim of ownership, but it took actual possession of the recording in the only meaningful sense it could: by distributing the record and retaining for itself all monies received therefrom. Indeed our only real question is whether defendants' actions were "continuous" and "uninterrupted" during the entire statutory period—three years in New York, six in Pennsylvania. While that concept has a readily ascertainable meaning in the case of land or tangible personalty like chattels, it is not obvious what constitutes "continuous" and "uninterrupted" use in

the case of a singing performance embodied in a record. One criterion would be how long defendants continued to receive money from the sale of the record. Another criterion would be how long the record was listed in the record company's catalogue as available for distribution. Another possibility would be to focus on whether the 1951 four volume album became part of the permanent collection of libraries, including the Library of Congress. In that event, the duration of its listing in library catalogues might be dispositive.

■ In interrogatory # 25 of plaintiffs' second set of interrogatories, defendants are asked to identify "all Columbia record albums containing songs by Bessie Smith exclusively, which are currently available from or offered for sale by Columbia to members of the public throughout the United States." Defendants' answer shows that as of September 9, 1977, both Volume 1 of the 1951 album series, containing Columbia's claim to ownership of all 160 songs, and Volume 3 of that series, containing the song "At the Christmas Ball," were "currently available or offered for sale by Columbia to members of the public throughout the United States." Plaintiffs have not challenged the fact that Volumes 1 and 3 were available as of September 1977. Moreover, we take judicial notice of the fact that a current Schwann record catalogue (regarded as authoritative in the industry) lists both Volume 1 and Volume 3 of 1951 series as still available to the record buying public.[28] While the above does not explicitly confirm that the records in question have been *continuously* available from 1951 to the present, given the fact there has been no "*re*-issuance" of Volumes 1 and 3 at any time (which one would expect if their original "issuance" had been discontinued or interrupted at some point during the interim), that is the only reasonable inference we can draw.

■■ We think the fact that defendants have made Volumes 1 and 3 of the 1951 album series available between 1951

---

**28.** *See* Schwann Record and Tape Guide—2 Fall and Winter at 78–79.

and 1978 satisfies the "continuous" requirement for purposes of adverse possession. Since the volumes have been continuously available from 1951 to August 1978, they were *a fortiori* available to the public throughout the respective New York and Pennsylvania statutory periods of three and six years. Hence, under New York law, Columbia's arguably wrongful possession of exclusive rights to "At the Christmas Ball" ripened into complete and perfect ownership, good against Bessie Smith's estate, by 1954. Under Pennsylvania law, complete rights vested in Columbia in 1957. This vesting extinguished any possibility plaintiffs could sue on this claim with respect to the 1970's re-recordings or otherwise long before suit was brought in 1975. Hence we will grant defendants' motion for summary judgment [29] with respect to any claims related to "At the Christmas Ball."

### D. *Performance Rights in Sound Recordings—The Technology and Pricing Control of Records*

#### 1. *Introduction*

The previous section, focusing on "At the Christmas Ball," assumed that both New York and Pennsylvania would recognize a property right in a singer's performance of a song at a recording session when the singer was not paid for recording *that particular song*, but was paid for others. We now must re-adjust our focus. What, if any, rights did Bessie Smith acquire between 1923 and 1931 in the recordings for which she *was* paid? This time we are not assuming any such rights, but instead are inquiring as to their existence as against defendants' motion to dismiss. (Plaintiffs have not moved for summary judgment on this part of the claim).

Plaintiffs' assertion is that Bessie Smith recorded some 180 songs for Columbia between 1923 and 1931, and was paid for approximately 160 of them. Those songs were re-recorded for the 1951 album series, and again for the 1970–72 album series. Plaintiffs assert that defendants' method of re-recording and packaging on both occasions infringed rights Bessie Smith originally acquired by virtue of her style and manner of performance. The alleged acts of infringement consisted of: (1) the technology used in the '50's and '70's; (2) the prices charged in the '50's and '70's; and (3) the assembly and design of albums, as opposed to the original discrete 78 rpm records.

Plaintiffs do not contend they can show that Bessie Smith ever reserved any of these kinds of rights to herself as a contractual matter. Indeed, the only contractual documents of which we are aware (the validity of which plaintiffs dispute) clearly show she did not. Nor do plaintiffs claim that Smith orally reserved such rights in negotiations before her recording sessions. Rather, they ask that we imply in her favor various kinds of property rights which govern the manner and method by which defendants may re-record and re-issue Bessie Smith's original performances. We examine the claim under both Pennsylvania and New York law to determine whether it states a cognizable ground for relief.

#### 2. *Pennsylvania Law*

Plaintiffs rely upon two decisions, the first by the Pennsylvania Supreme Court in *Waring v. WDAS Broadcasting Station, Inc.*, 327 Pa. 433, 194 A. 631 (1937), the second by the Third Circuit in *Ettore v. Philco Broadcasting Corp.*, 229 F.2d 481 (3d Cir.), *cert. denied*, 351 U.S. 926, 76 S.Ct. 783, 100 L.Ed. 1456 (1956).

In the *Waring* case, the popular orchestra leader Fred Waring negotiated a contract to record music for the corporate predecessor of RCA Victor. Both parties reached an understanding that the records to be issued were intended for home use only, not for

---

**29.** Though our inference of *continuous* availability of the albums appears to us the only one reasonable in these circumstances, if plaintiffs can make some showing that either Volume 1 or Volume 3 was not continuously available to the public from 1951 to 1957 (the longer of the two statutory periods at issue) within twenty days of the entry of the accompanying order, we will vacate our grant of summary judgment on this claim, and proceed to trial on the question of the availability of the records.

broadcast over the radio. A negotiated provision of the contract called for Victor to affix the words "Not licensed for radio broadcast" as a label upon each record it manufactured. Victor did so. When radio station WDAS ignored the label and broadcast the record over the airwaves without compensating Waring, he sued. The Pennsylvania Supreme Court, as a court sitting in equity, examined whether what it styled a "reservation" (*i. e.* the licensing label) attaching to "personalty" (*i. e.* Waring's orchestra's sound) should be enforced on policy grounds. It found equitable reasons for so doing, finding too that there was no significant "restraint of trade" involved in such a reservation. On an alternative theory, the court applied a doctrine of "unfair competition," which it defined as "an unfair appropriation of the product of another's labor or talent."

▇ In our judgment, *Waring* supports plaintiff's claim only to the extent that Pennsylvania would recognize an initial property right in the unique style and manner of Bessie Smith's singing:

> A musical composition in itself is an incomplete work; the written page evidences only one of the creative acts which are necessary for its enjoyment; it is the performer who must consummate the work by transforming it into sound. If, in so doing, he contributes by his interpretation something of novel intellectual or artistic value, he has undoubtedly participated in the creation of a product in which he is entitled to a right of property, which in no way overlaps or duplicates that of the author in the musical composition.

*Id.* at 441, 194 A. at 635. The *Waring* decision is absolutely no support, however, for the theory that instant defendants have *misappropriated* that property right. Had *Waring* addressed itself to the right of Victor Records to re-record Waring's orchestra, it would have been on point. Since it involves the right of Waring to enforce, against a third party, a licensing restriction negotiated between himself and his record company, it cannot further support plaintiffs here.

The *Ettore* decision built upon *Waring*. Plaintiff Ettore was a professional boxer who fought Joe Louis in Philadelphia in 1936. He was knocked out in the fifth round. He consented to have professional movies made of the fight, for which he was paid. Thirteen years later, NBC broadcast selected rounds of the fight through its television network without compensating Ettore or seeking his permission. The *Ettore* court found in pugilists the same property right, which it called the "right to control [one's] performance" that the *Waring* court located in musicians (and which it had limited to a certain class of gifted musicians and dramatic performers). The significance of *Ettore* lies in its extension of *Waring* to cover a situation where the performer has *not* attempted to reserve a right (as Waring clearly had). The Third Circuit found that Ettore could not have reasonably thought of reserving television broadcast rights to his boxing match because television was in its most embryonic stages of development at that time. The text of the opinion, including the footnote, is crucial:

> Radio broadcasting was rather well established at the time when Waring made his records. Commercial television, as we have stated, was not in existence at the time of the Ettore-Louis contest. Fairness would seem to require that a court treat the absence of the new or unknown media, television in the instant case, as about the equivalent of a reservation against the use of the work product of the artist or performer by a known medium, radio broadcasting in Waring's case.[14]

[14] Some light on the question of whether Ettore's mind should have adverted to the films of his contest with Louis being employed in commercial telecasts is thrown by a statement made by Roger Burlingame in Engines of Democracy, Charles Scribner's Sons, 1940, p. 460. Mr. Burlingame stated: "The invention [television] is nearly as old as radio, yet almost twenty years after radio became a commonplace in America, television is still, largely, in an experimental stage as far as society is concerned.

For many years after the technology was perfected, the questions 'What is it for?' and 'Who wants it?' have prevented its entrance into commerce. In this respect it is one of the most curious phenomena in the history of invention. In respect to social effect its influence, to date, is nil."

It would be obviously unfair to state that Ettore's mind should have adverted to a possible commercial telecast of the films in 1936 when the Ettore-Louis contest was held.

229 F.2d at 491.

Plaintiffs read *Ettore* as supporting their position by analogy. They assert that Columbia made the original records, between 1923 and 1933, by "primitive means." Memorandum at 36. Because of this, Bessie Smith's mind could no more "have adverted" to the possibility that in 1951 Columbia would avail itself of "the addition of echo, [and] the use of equalization and octave filters," than Ettore's mind could "have averted" to the possibility that television would come into widespread social use. *A fortiori*, Smith certainly could not have "contemplated" the kind of technology that would be used in re-recording in the 1970's, which by plaintiffs' description employed many innovative recording techniques.

We think, however, that plaintiffs' interpretation of *Ettore* has ignored the fundamental equitable notion at the heart of that case. Finding that a boxer had a property right in his performance, the court held that he had as much right to share in the advent of television as did the movie company with whom he had contracted years before. If a fortuitous social development (*i. e.* the development of commercial television) had placed a pot of gold at the feet of the "owner" of the fight film, then Ettore had an equitable right to claim part ownership, and the fact he had not "reserved" such a right in 1936, when the right was essentially unknown, unforeseeable, and unreservable, would not bar his claim to partial ownership. No comparable circumstances exist in this lawsuit. By plaintiffs' own admission, defendants are not attempting to take advantage of a new medium, which society has developed, and which

they are in the fortuitous position to exploit. Quite the contrary, from all that appears in the allegations and record, they simply applied technology they themselves developed, at presumably their own risk and great expense, to precisely the medium of entertainment contemplated by Bessie Smith in the original recording sessions. To recast *Ettore* in our mold would be to imagine that the movie company, having obtained the right to record and show the fight film in 1936, then developed techniques twenty years later for sharpening the focus of the film and removing blemishes and spots from the original, and re-issued a film made with this new process. We think it inconceivable the *Ettore* court would have held this to be a "misappropriation" of the fighter's property right, and would have summoned forth the hand of equity to halt it. It is inconceivable, first because it is not misappropriation of anyone's property, and second because on policy grounds, such a doctrine might retard technological progress. Yet it is precisely this version of *Ettore* that plaintiffs have urged upon us.

■ For precisely the same reason that we cannot read *Ettore* to bar the re-recording of a song using new technology, neither can we read that case to authorize "implying" the right of an artist to control the future prices charged for records or the method by which they are assembled or packaged. Bessie Smith, by the allegations and undisputed record, clearly did not have any such control over the records made between 1923 and 1933. We fail to see on what basis *Ettore*'s equitable principles can imply greater and different right with respect to records made decades later.

This is not to say we read *Waring, Ettore* and other Pennsylvania case law as setting no boundaries on a record company's right to re-record songs. As an extreme example, if the re-recording had been done to intentionally ridicule or humiliate Bessie Smith—as by introducing a Spike Jones cacophony of bicycle horns, sirens, and the like as "background"—she or her estate

would almost certainly have a cause of action. We note in this regard that part of the contention in *Ettore* was that plaintiff's "best" round had been edited from the telecast, allegedly causing "his friends to deride him." 229 F.2d at 483. A somewhat related claim formed the gravamen of the recent Monty Python litigation in the Second Circuit: that in "editing" the broadcasts for American commercial taste and format, the American broadcasters had fundamentally misrepresented the nature of the artistic performance. *See Gilliam v. American Broadcasting Companies*, 538 F.2d 14 (2d Cir. 1976); Comment, *Protection of Artistic Integrity*, 90 Harv.L.Rev. 473 (1976). We cannot, however, find a genuine issue of material fact concerning either the intent or the consequence of defendants' 1951 or 1970–72 re-recordings, *i. e.*, there is no suggestion of any intent to defame Bessie Smith or misrepresent her artistic performance, nor is there any suggestion that the re-recordings had this effect.

In sum, we find no claim with respect to the re-recordings that would be cognizable under Pennsylvania law.

### 3. *New York Law*

We are confronted with the threshold issue of whether New York recognizes the kind of property right in a musician's performance that *Waring* and *Ettore* recognize. We have found no analog to those two decisions; rather we have found a good deal of case law that intimates New York's protection for performers may be much more restrictive than Pennsylvania's.

A case in point is *Miller v. Universal Pictures Company*, 11 A.D.2d 47, 201 N.Y.S.2d 632 (1960), *aff'd*, 10 N.Y.2d 972, 224 N.Y.S.2d 662, 180 N.E.2d 248 (1961). The widow of Glenn Miller, the legendary orchestra leader, sued a motion picture and a record company which had, without her permission, taken meticulous pains to re-create the Glenn Miller "sound" by hiring and training an orchestra for the movie "The Glenn Miller Story." In dismissing the suit,

the court stated: "Plaintiff never had, and certainly does not now have, any property interest in the Glenn Miller 'sound.' Indeed, in the absence of palming off or confusion, even while Glenn Miller was alive, others might have meticulously duplicated or imitated his renditions." 201 N.Y.S.2d at 634. The language we have quoted was subsequently cited with approval in the unanimous Court of Appeals' opinion, *Shaw v. Time-Life Records*, 38 N.Y.2d 201, 379 N.Y.S.2d 390, 341 N.E.2d 817 (1975).

We have examined other New York decisions to find the scope of a performer's rights. Several cases establish the kinds of protection that New York law does afford performers. One kind of protection is from record privacy. Judge Steuer accurately summarized that line of cases in his dissenting opinion in *Flamingo Telefilm Sales, Inc. v. United Artists Corp.*, 24 A.D.2d 953, 265 N.Y.S.2d 444 (1965) (per curiam):

It is quite true that the principles of unfair competition as expanded in commercial cases have been applied by state courts in cases involving literary or artistic productions . . . .. In all of these cases the subject matter was not susceptible of copyright. The rendition of an aria, the technique of a virtuoso, or the delivery of an orator cannot be copyrighted. Until fairly recently their artistic endeavors were perishable and once given were forever lost. Now they can be mechanically recorded and, if so, the resultant disk or tape can be copyrighted. What these cases hold is that the performance may not be pirated by recording it and selling the recording without the performer's permission.

265 N.Y.S.2d at 447 (citations omitted). There is no issue of record piracy in our suit, and this line of case law therefore can offer no support.

A closely related protection was identified in *Gieseking v. Urania Records*, 17 Misc.2d 1034, 155 N.Y.S.2d 171 (Sup.Ct. 1956). Plaintiff, a renowned pianist, was under contract with a record company. A

competitor allegedly made reproductions from phonograph records of plaintiff's performances and sold them as plaintiff's performances. They were allegedly of inferior record quality. Relying on New York's Civil Rights Law, §§ 50 & 51, the court summarized the scope of the right in this fashion: "A performer has a property right in his performance that it shall not be used for a purpose not intended, and particularly in a manner which does not fairly represent his services." 155 N.Y.S.2d at 172. Walter Gieseking clearly did not "intend" that Urania Records would issue recordings of his work; Bessie Smith, based on her undisputed ten year exclusive artistic arrangement covering 180 recordings, clearly *did* intend that Columbia Records would issue recordings of her performances. Therefore, the *Gieseking* case is of no support to plaintiffs.

The final source of protection we have been able to locate in the New York cases is the "unfair competition" notion of "palming off" or "confusion." It was well illustrated in *Shaw v. Time-Life Records*, 38 N.Y.2d 201, 379 N.Y.S.2d 390, 341 N.E.2d 817 (1975), in which the Court of Appeals considered a suit by the famous bandleader Artie Shaw. Time-Life Records, had á la *Miller*, "meticulously duplicated and imitated" his sound without permission by using a modern orchestra. Citing *Miller*, the court said *that alone* was not actionable. But Time-Life, Inc. did more: it advertised the record as "Artie Shaw versions" of Swing Era songs. According to the court, that advertisement created a material issue of fact as to whether a reasonably intelligent consumer would be fooled into thinking he or she was purchasing a record actually made by Artie Shaw.

There is no genuine issue of material fact of "palming off" or "confusion" in our case. In the first place, it would be a strange use of that doctrine to apply it to one's own re-recordings, rather than to recordings by another person. In the second place, the record shows the albums at issue are clearly and accurately identified.

We conclude that New York law would not imply any right to control technology, right to control prices of records, or right to control assembling and format of albums as property rights incident to a musician's performance. Our view of New York law, coupled with our conclusion that no such protection to performers is accorded under Pennsylvania law either, compels us to conclude that defendants are entitled to a judgment as a matter of law under the laws of both possibly concerned jurisdictions. Hence as to this aspect of Count IV we shall grant their motion for summary judgment.

## VI. *Misappropriation of Property Interest in Name*

Plaintiffs' final claim is incorporated in Count V as follows:

### COUNT V

### MISAPPROPRIATION OF PROPERTY INTERESTS IN NAME, PERSONALITY, LIKENESS AND PUBLICITY RIGHTS OF BESSIE SMITH

44. By the actions of defendants as aforesaid, and by other means and activities of defendants in the past and of a continuing nature, defendants without authorization and without compensation to the plaintiffs, are commercializing for great profits, the name, image, likeness, and personality of Bessie Smith all to the great loss and detriment of the plaintiffs.

45. Unless defendants are enjoined from these activities, plaintiffs will continue to suffer great loss and detriment to the unjust enrichment of defendants, and will otherwise be forestalled from contracting with others for a profit, the use of the name, personality, and likeness of Bessie Smith.

In this count, plaintiffs rely on an emerging body of case law which recognizes a "right of publicity" different from the traditional "right of privacy:" a right to the

commercial value of one's image, likeness and name. The doctrine was first explicitly recognized fashion in *Haelan Laboratories, Inc. v. Topps Chewing Gum, Inc.,* 202 F.2d 866 (2d Cir. 1953) (based on New York law). Pennsylvania has also recognized the "right of publicity" in an action by the golfer Ben Hogan, *Hogan v. A. S. Barnes & Co.,* 114 U.S.P.Q. 314 (Philadelphia County Court of Common Pleas 1957), as have numerous other jurisdictions. *See Price v. Hal Roach Studios, Inc.,* 400 F.Supp. 836 (S.D.N.Y. 1975); *Uhlaender v. Henricksen,* 316 F.Supp. 1277 (D.Minn.1970); *Sharman v. C. Schmidt & Sons, Inc.,* 216 F.Supp. 401 (E.D. Pa.1963); and cases cited in Note, *The Right of Publicity-Protection for Public Figures and Celebrities,* 42 Brooklyn L.Rev. 527 (1976). Two recent cases in this line have involved the right to the continued use of the name, image and likeness of the late Elvis Presley. *See Factors Etc., Inc. v. Creative Card Co.,* 444 F.Supp. 279 (S.D.N. Y.1977); *Memphis Development Foundation v. Factors, Etc., Inc.,* 441 F.Supp. 1323 (W.D.Tenn.1977), *aff'd mem.,* 578 F.2d 1381 (6th Cir. 1978).

It is unnecessary for us to address the substance of plaintiffs' claim in Count V in any detail, for plaintiffs have expressly stated that Count V is wholly dependent on the other four counts, and only follows as a ground for liability "if plaintiffs prevail" on the other counts. Plaintiffs' memorandum at 39. Since the other counts must all be dismissed, so too must Count V.

■ We add, by way of postscript, that plaintiffs' concession is well grounded. For if Columbia possessed all the incidents of ownership of Smith's songs and recordings as described in this opinion, then Columbia plainly possessed the right to use Smith's name and likeness and photograph. Count V, then, is also lacking in merit, and must be dismissed.

We have now considered all of the allegations of plaintiff's complaint and conclude that they all fail and that they must either be dismissed or summary judgment must be granted for Columbia with respect thereto.

APPENDIX A–

| | MONTH LISTED | 4TT iD | DATE PAID | DATE O.K'D | PUB. | TITLE | MATRIX NO. | DATE MADE |
|---|---|---|---|---|---|---|---|---|

APPENDIX B–

**EXCLUSIVE ARTIST.**

| CONTRACT-DATED | DATE MADE | MATRIX NO. | TITLE | DATE O.K'd | DATE PAID | | LIST |
|---|---|---|---|---|---|---|---|
| YEARS | | | | | | | |
| COMMENCING | | | | | | | |
| ENDING | | | | | | | |
| RECORDINGS | | | | | | | |
| ROYALTY | | | | | | | |
| ADV-ON-ACCT. | | | | | | | |
| FLAT PAYMENT | | | | | | | |
| RENEWAL-OPTION | | | | | | | |
| RENEWAL-NOTICE | | | | | | | |
| REMARKS: | | | | | | | |

D-17